UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――― x

LOCALS 302 AND 612 OF THE :    Civil Action No.
INTERNATIONAL UNION OF OPERATING :
ENGINEERS – EMPLOYERS :
CONSTRUCTION INDUSTRY :    VERIFIED SHAREHOLDERS'
RETIREMENT TRUST, INDIANA :    DERIVATIVE COMPLAINT FOR BREACH
ELECTRICAL WORKERS PENSION :    OF FIDUCIARY DUTY, ABUSE OF
TRUST FUND IBEW, and DONG WEN, :    CONTROL, GROSS MISMANAGEMENT,
Derivatively on behalf of NORTEL :    UNJUST ENRICHMENT AND
NETWORKS CORPORATION, :    CONSTRUCTIVE FRAUD SEEKING
   :    EQUITABLE RELIEF AND DAMAGES
   :
             Plaintiffs, :
   :
   :
     vs. :
   :
JAMES J. BLANCHARD, ROBERT E. :
BROWN, JOHN E. CLEGHORN, L. YVES :
FORTIER, ROBERT A. INGRAM, :
GUYLAINE SAUCIER, SHERWOOD H. :
SMITH, JR., LYNTON R. WILSON, FRANK :
C. CARLUCCI, FRANK A. DUNN, :
DOUGLAS C. BEATTY, MICHAEL J. :
GOLLOGLY, NICHOLAS J. DeROMA, :
JOHN A. ROTH, CLARENCE J. :
CHANDRAN, BRIAN W. McFADDEN, :
JEAN C. MONTY, CHAHRAM BOLOURI, :
MALCOLM K. COLLINS, RICHARD J. :
CURRIE, PASCAL DEBON, JAMES :
KINNEY, KEN TAYLOR, CRAIG A. :
JOHNSON, SUSAN L. SPRADLEY, GARY :
R. DONAHEE, FRANK PLASTINA and :
DOUG HAMILTON, :
   :
             Defendants, :
   :
     - and – :
   :
NORTEL NETWORKS CORPORATION, a :
Canadian corporation, :
   :
          Nominal Defendant. :

―――――――――――――――――――― x    <u>DEMAND FOR JURY TRIAL</u>

Copyright © 2004 by William S. Lerach and Lerach Coughlin Stoia & Robbins LLP.  William S. Lerach and Lerach Coughlin Stoia & Robbins LLP will vigorously defend all of their rights to this writing/publication.  No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

All rights reserved – including the right to reproduce in whole or in part in any form.  Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia & Robbins LLP is prohibited.

# PREAMBLE

*"Quis Custodiet Custodies?"*
*"But Who Will Guard the Guards Themselves?"*

*Juvenal*

**"Is there a sorrier company in Canada today than Nortel Networks Corp.?"**
***Toronto Star***, April 29, 2004

# INTRODUCTION AND SUMMARY OF THE ACTION

1.       This is a shareholders' derivative action on behalf of Nortel Networks Corporation ("Nortel") against several of Nortel's current and past executives and directors, including nine of eleven of Nortel's current directors and both its current Chairman and Chief Executive Officer.  The claims arise from defendants' grossly negligent and reckless acts, including misrepresenting the condition of Nortel's business to Nortel's shareholders, manipulating and falsifying Nortel's reported financial results and allowing Nortel's top executives and managers to loot Nortel of hundreds of millions of dollars via bonuses paid based on phony profits.  Defendants' actions caused Nortel to lose billions of dollars, nearly bankrupted Nortel and all but wiped out Nortel's shareholders' equity, while crippling its business, gravely impairing its credit standing and corporate reputation and goodwill.  This action seeks to remedy these breaches of fiduciary duty, abuse of control, fraud, unjust enrichment and gross mismanagement.

2.       Defendants' misconduct caused Nortel to violate the U.S. investor protection and retirement securities laws, including the Sarbanes-Oxley Act, resulting in massive class action suits against Nortel for violations of the United States Federal Securities Laws and the United States Employee Retirement Income Security Act ("ERISA"), as well as major U.S. Department of Justice ("DOJ") and U.S. Securities and Exchange Commission ("SEC") investigations of Nortel.  ***Nortel's top executives and its managers have pocketed hundreds of millions of dollars of bonuses based***

*on faked profits*.  Yet their misconduct has left Nortel exposed to billions of dollars of liability for violations of the U.S. investor protection and retirement security laws and already caused it to suffer huge damages, including the expense of defending those civil suits and regulatory and criminal investigations of Nortel and the damages, financial penalties and/or fines which will result from those proceedings.

## OVERVIEW OF COMPLAINT

3.    During 1998-2000, Nortel's then top executives and directors caused Nortel to pursue a massive expansion plan, through acquisitions of other companies.  Nortel's then top executives and directors did this, in large part, because they believed that if they could increase the size of Nortel's business and, at the same time, cause Nortel to report strong revenue and earnings, they would be in a position to vastly increase their prestige, as well as their personal "take" from their positions of power, prestige and profit at Nortel in the form of salaries, bonuses, benefits, other forms of compensation and "perks," which would increase if Nortel's size and profits increased.

4.    During 1998-2000, Nortel's then top executives and directors caused Nortel to acquire 18 companies for over $30 billion – virtually all of which were acquired in return for Nortel stock – in many instances, paying billions and billions of dollars more than the true worth as well as the actual value of the assets of these acquired companies.  By paying more than the actual value of the acquired company's assets, Nortel had to put on its balance sheet billions of dollars of "goodwill," which it was then required to periodically amortize, which would result in Nortel incurring large losses under Generally Accepted Accounting Principles ("GAAP") for many years. In order to deflect attention from those large GAAP losses, Nortel's then top executives and directors caused Nortel to begin to also report its results in a "pro forma" manner, which created something Nortel called "operating" profits, which presented an illusion of profitability because pro

forma accounting, *inter alia*, ignored the huge amortization of goodwill charges required by GAAP. By this technique, Nortel's then top executives and directors could tell Nortel's shareholders that the Company was actually "profitable," which, in turn, justified the rich compensation, benefits and huge cash bonuses paid to Nortel's executives based on those operating profits.

5.      However, by 2000, Nortel's massive, rapid expansion plan had gone out of control. Nortel's top executives and directors had acquired far too many companies in far too short a time – and, in many instances, had grossly overpaid for those acquisitions – making most of them simply so they could add those companies' revenues to Nortel's revenues to make Nortel appear to be growing larger and achieving increasing (pro forma) profitability.  Due to the large number of acquisitions Nortel's top executives and directors had caused it to make in such a short period of time, Nortel had not been able to perform the type of pre-acquisition investigations and due diligence necessary to protect Nortel from overpaying for acquisitions or purchasing companies with serious operating problems.  This resulted in Nortel, by early 2000, ending up with a number of over-priced, ill-performing acquisitions, which Nortel was unable to successfully integrate into its business operations or its internal accounting, information technology and disclosure control systems.

6.      By 2000, Nortel's acquisition program was badly harming Nortel's business operations – a reality which Nortel's then top executives and directors concealed by not only stressing its pro forma profitability, but also by not properly and in a timely fashion writing down billions of dollars of excessive goodwill carried on Nortel's balance sheet in connection with those acquisitions (which were actually worth billions of dollars less than Nortel had paid for them) and by falsifying Nortel's financial statements in various other ways to boost Nortel's reported operating (pro forma) profits.

7.     To make matters worse, by 2000, the Internet and telecommunications sectors – which were the two focal points of Nortel's business – were encountering very adverse market conditions, resulting in companies in those areas sharply curtailing orders from their suppliers, including Nortel.  This was very adversely impacting Nortel's business.  Nortel's Internet- and telecommunications-related customers were canceling or reducing orders of new products and either returning or delaying payment for products that had already been received.  Indeed, by mid-2000, several of Nortel's largest customers, including WorldCom and SBC, had substantially *decreased* orders for Nortel products and informed Nortel that orders in the last half of 2000 and for 2001 would be *even lower*.  As a result, as 2000 progressed, Nortel's business was imploding, due to the negative impact of these adverse market conditions.

8.     In order to cover up their own gross mismanagement of Nortel, Nortel's then top executives and directors concealed the deterioration of Nortel's business to try to hold on to their positions of power, prestige and profit for as long as possible, which positioned them to loot Nortel of millions of dollars *if they could cause Nortel to report large operating profits for 2000*.

9.     As part of this cover-up, during 2000, Nortel's then top executives and directors lied to Nortel's shareholders and investors regarding the ongoing success and profitability of Nortel's business, as well as its future prospects.  They did this by manipulating and inflating Nortel's reported revenues and results from operations, enabling Nortel to report record 2000 revenues and operating profits.  They also falsely assured Nortel's shareholders and investors that notwithstanding deteriorating market conditions in Nortel's main business areas and the problems being encountered by its competitors, Nortel's business was continuing to perform extremely well due to unique factors, including the skills of its management team, which insulated Nortel from any adverse impact of these negative conditions, giving it a competitive advantage.  They also repeatedly assured

- 4 -

Nortel's shareholders and investors that during 2001 Nortel would continue to achieve the 30%-40% historical growth it had previously achieved. As a result of these manipulations and deceptions, Nortel's stock traded at artificially inflated levels, reaching its all-time high of $124 in mid-2000. And, as a result of Nortel's purported massive revenue and operating earnings growth during 2000, in early 2001, Nortel's top executives and managers cashed in. Nortel insiders John Roth, Frank Dunn, Clarence Chandran, Chahram Bolouri, Pasal Debon, Gary Donahee, Frank Plastina and Nicholas DeRoma pocketed cash bonuses of $5,636,250, $1,014,515, $2,675,000, $807,836, $717,375, $1,059,840, $880,800 and $715,307, respectively, based on Nortel's record 2000 revenues and "operating" profits, while their Nortel stock options and other stock rights soared in value by millions and millions of dollars.

10. As long as Nortel's stock continued to trade at artificially inflated levels, Nortel could continue its strategy of acquiring other Internet- or telecommunications-related companies, using its shares as currency. Thus, despite the continuing slowdown in the Internet and telecommunications sectors in the United States during 2000, Nortel's then top executives and directors repeatedly issued false representations to Nortel's shareholders and investors that were designed to reassure them that Nortel continued to be on a track of strong growth in revenues and operating earnings. Typical of these false and misleading reassurances to Nortel's shareholders and investors were statements made on November 1, 2000:

> "We continue to expect that our percentage growth in revenue and earnings per share from operations in 2000 over 1999 will be in the low 40's," said John Roth, president and chief executive officer, Nortel Networks. "In response to specific requests for guidance on the fourth quarter of 2000, *we expect our revenue and earnings per share from operations in the fourth quarter of 2000 will be in the range of US$8.5 billion to US$8.8 billion and US$0.26 per share* on a fully diluted basis, respectively. Overall, *we expect continued strong growth in Optical Internet, Wireless Internet, Local Internet and eBusiness solutions. We continue to expect our optical Internet revenues to grow in excess of 125 percent in 2000 over 1999, to exceed US$10 billion*."

"Looking forward to 2001, we continue to expect the overall market to grow in excess of 20 percent.  Given our strong market position and leadership in high performance Internet solutions, we continue to expect to grow significantly faster than the market, with anticipated growth in revenues and earnings per share from operations in the 30 to 35 percent range," said Roth.  "For the first quarter of 2001, consistent with historical profile trends, we expect our revenue and earnings per share from operations will be in the range of US$8.1 billion to US$8.3 billion and US$0.16 per share on a fully diluted basis, respectively."

11.    Nortel's top executives and directors caused Nortel to make similar false and misleading statements throughout the third and fourth quarters of 2000 and in January 2001. However, at the same time they were aggressively reassuring the investing public that Nortel would continue to achieve strong revenue growth and operating profitability in 2001, demand for Nortel's mainstay products was declining sharply and its revenue growth rate was contracting.

12.    In addition to issuing these false assurances and forecasts throughout the second half of 2000 and early 2001, Nortel's top officers and directors were also able to prolong an illusion of strong revenue and earnings growth, when in fact it did not exist, by engaging in various manipulations to falsify Nortel's reported financial results.  It was only through these financial manipulations, including the "cannibalization" of 2001 revenues, that Nortel's top officers and directors were able to cause Nortel to report substantial revenue and pro forma profit growth in the third and fourth quarters of 2000 and for 2000 as a whole:

### NORTEL REVENUES

|      | 1stQ   | 2ndQ   | 3rdQ   | 4thQ   | Year     |
|------|--------|--------|--------|--------|----------|
| 1999 | $4.42B | $5.41B | $5.39B | $6.99B | $22.22B  |
| 2000 | $6.32B | $7.82B | $7.31B | $8.82B | $30.28B  |

### NORTEL OPERATING (PRO FORMA) PROFITS

|      | 1stQ   | 2ndQ   | 3rdQ   | 4thQ   | Year    |
|------|--------|--------|--------|--------|---------|
| 1999 | $222M  | $368M  | $380M  | $755M  | $1.73B  |
| 2000 | $347M  | $561M  | $574M  | $825M  | $2.31B  |

13.     To improperly inflate Nortel's reported revenues and operating profits during 2000 and early 2001, Nortel's top officers and directors:  (i) improperly used "vendor financing" to generate billions of dollars of illusory revenues; (ii) engaged in a series of improper practices that caused Nortel to recognize improperly hundreds of millions of dollars of revenue; (iii) failed to properly account for hundreds of millions of dollars of uncollectible receivables; and (iv) failed to timely and properly recognize at least $12.5 billion in losses in connection with certain of Nortel's Internet and telecommunications acquisitions for which Nortel had grossly overpaid and which were by then largely worthless.

14.     *First*, Nortel's top executives and directors caused it to use "vendor financing" to artificially inflate and improperly recognize billions of dollars in revenues.  Nortel's top executives and directors improperly, and in violation of commercially prudent and Nortel's own lending standards, extended ***hundreds of millions of dollars of credit and additional financing to known uncreditworthy customers*** so that they could purchase Nortel products that they normally could not afford and would not have purchased, thereby generating improper revenues for Nortel.

15.     *Second*, Nortel's top executives and directors used a variety of other means to improperly recognize and report revenues:

(a)     Nortel pressured customers to purchase unwanted or unneeded products that they knew were likely to be returned or not paid for;

(b)     Nortel improperly "pulled forward" hundreds of millions, if not billions, of dollars of 2001-2002 revenues into the third and fourth quarters of 2000, in order to make it appear that Nortel had met its forecasted financial results for 2000;

(c)     Nortel improperly recognized huge amounts of revenue based upon letters of intent, in violation of its own internal rules as well as GAAP, which required a formal purchase order to allow revenue recognition; and

(d)     Nortel improperly recognized revenue on "sales" prior to the expiration of the date by which customers were permitted to return product without cause or question.

16.     *Third*, Nortel's top executives and directors failed to properly account for or sufficiently reserve for hundreds of millions of dollars of uncollectible receivables that were generated by certain of the improper financial manipulations described above.  In addition to extending billions of dollars of vendor financing to uncreditworthy customers to enable them to purchase Nortel products, they also caused Nortel to provide these same customers with huge "working capital" loans, to provide them with funds to finance their ongoing business operations. These unsecured loans carried huge risks because they were not secured and the customers to which the loans were extended did not have viable business plans or models and were actually experiencing a precipitous decline in their businesses as a result of negative market conditions.  These loans were a waste of Nortel's assets as they were largely uncollectible.  Nortel was later forced to drastically *increase* its reserve for uncollectible receivables by hundreds of millions of dollars on drastically *declining* revenues.

17.     *Fourth*, when repossessing Nortel products from vendor-financed customers who had defaulted on their credit agreements with Nortel, for purposes of inventory valuation, Nortel's top executives and directors caused it to improperly not take a charge against earnings to account for the fact that the value of the products had deteriorated substantially below cost because the products were used and, in some cases, had been rendered obsolete by new technology.

18.    ***Fifth***, when the deterioration of the Internet sector, Nortel's key customer base, evolved into a collapse in mid-2000, Nortel's top executives and directors deliberately caused it to not write down the value (goodwill) on several of its major acquisitions for which they had earlier caused Nortel to grossly overpay and which were not worth anything near the value Nortel attributed to them.  ***Instead, they caused Nortel to not take any write-off for any amount for an entire year until Nortel finally had to write off approximately $12.4 billion at one time in the second quarter of 2001***.  Astoundingly, the combined purchase price of these four acquisitions was approximately $17 billion, meaning that in the space of a single quarter (*i.e.*, between the first and second quarters of 2001), four of Nortel's largest acquisitions lost ***approximately 75% of their value***, when, in fact, losses of that magnitude did not suddenly occur, but were spread out over an extended period of time.  The $12.4 billion write-off, one of the largest in history, was taken at one time as if all of this loss occurred in the space of one quarter, which obviously was not the case.

19.    In early 2001, Nortel reported 2000 revenues of $30.28 billion up from $22.22 billion in 1999 and operating (pro forma) profits of $2.31 billion, compared to $1.73 billion for 1999, which allowed Nortel's top executives to pocket millions of dollars of bonuses.  However, by mid-February 2001, Nortel's then top executives and directors could not perpetuate their deceptive scheme any longer, as Nortel's operations had deteriorated so disastrously that this, combined with the continuing decline in business conditions in its main markets, had made it impossible to conceal the troubled and deteriorating nature of Nortel's business any longer.  Thus, beginning in February 2001, in a series of shocking revelations, Nortel's top executives and directors admitted that Nortel's repeated forecasts of continued strong growth in 2001 were false and would not be achieved, as events revealed that Nortel's reported financial results for 2000 had been widely exaggerated.

20.     On February 15, 2001, Nortel suddenly and drastically cut Nortel's growth forecasts for 2001.  The market was stunned by this revelation, which came less than one month after Nortel's top executives and directors had provided very positive reassurances regarding its 2001 revenue and earnings prospects.  Nortel's stock price plunged.  During 2001, as the truly impaired condition of Nortel's business and finances continued to be revealed over the next several months, Nortel's stock price never recovered, ultimately falling to less than $1 per share in 2002 from its all-time high of $87.

21.     Despite the fact that, throughout 2000 and during early 2001, Nortel's top executives and directors had caused Nortel to forecast 30%-40% growth in 2001, the collapse of the Internet and telecommunications sectors in 2000 and the fact that they had cannibalized much of Nortel's anticipated 2001 revenues in order to artificially boost Nortel's reported financial results for the third and fourth quarters of 2000, resulted in Nortel's reported revenues in 2001 being substantially below what was reported for the same period in 2000:

|  | 1stQ | 2ndQ | 3rdQ | 4thQ | Year |
|---|---|---|---|---|---|
| 2000 Revenues | $6.32B | $7.207B | $6.726B | $8.198B[1] | 27.948B |
| 2001 Revenues | $6.18B | $4.61B | $3.694B | $3.456B | 17.511B |
| % Change | -2% | -36% | -45% | -53% | -38% |

22.     As 2001 unfolded, Nortel was forced to take billions of dollars of writedowns on the acquisitions for which it had previously overpaid, which, combined with other losses, writedowns and charges, resulted in Nortel suffering astonishing losses of over $30 billion during 2001-2002, *wiping out all of its claimed operating profits for the past several years – operating profits upon*

---

[1]     This amount is lower than the revenue Nortel originally reported for the fourth quarter 2000, due to the exclusion of discontinued operations.

***which Nortel executives' year 2000 multi-million-dollar bonuses had been based***!  These gigantic writedowns and losses also virtually wiped out Nortel's shareholder equity, decimating its shareholder community which watched as Nortel's stock suffered a sickening decline to as low as $.47 per share in the Fall of 2002 – one of the worst stock price collapses in history.  The chart below shows the collapse of Nortel's stock:



In short, due to Nortel's top executives' and directors' fraudulent misconduct and gross mismanagement of the enterprise, Nortel suffered a catastrophic collapse, barely avoiding bankruptcy.

      23.     As a result of these events, in 2001, Nortel was sued for violation of the U.S. federal securities laws on behalf of all investors in securities of Nortel stock between October 24, 2000 and February 15, 2001 (the "First Class Action" or "*Nortel I*"), to recover damages caused by defendants' violations of the anti-fraud provisions of the federal securities laws.  Nortel was also

sued for alleged violations of ERISA during 2000-2001 in a class action suit.  Nortel is being forced to spend millions of dollars to defend these suits.  The complaints in these class actions have been upheld, resulting in Nortel facing billions of dollars of liability.

24.     While Nortel's then CEO (John A. Roth) and COO (Clarence Chandran) were put out of the Company as sacrificial lambs during 2001, Nortel's directors orchestrated their departures to assure that no independent outsider would obtain a top executive position at Nortel and thus be in a position to expose the manipulative and illegal conduct, and their involvement therein, that had gone on at Nortel during 1999-2000.  When Roth was replaced as CEO in late 2001, Nortel's directors replaced him with Frank A. Dunn, who had been the Chief Financial Officer of Nortel during 1999-2000 and thus was fully aware of — and an active participant in — the financial manipulations of 2000, which had yielded him a bonus of over one million dollars, so that his silence and cooperation could be counted on.  And to fill Dunn's critical position as CFO, the Nortel directors chose to elevate Douglas C. Beatty, who had been Nortel's corporate controller during 1999-2000 and, like Dunn, was fully aware of and an active participant in the 2000 financial manipulations at Nortel, which had yielded him a bonus of several hundred thousand dollars.  In fact, Dunn was named as a defendant in the *Nortel I* class action suit  and Nortel's directors knew, based on their own participation in the events covered by *Nortel I* and the investigation and evaluation made by them of that complaint, that the allegations against Dunn in *Nortel I* were true.  And to fill Beatty's position as corporate controller, Nortel's directors picked Michael J. Gollogly, who was assistant controller during 1999-2001 at Nortel and thus was also aware of and involved in the financial overstatements of 2000 and financially benefited therefrom.

25.     In 2001 and early 2002, as Nortel's new executive management team (led by Dunn and Beatty) took over, they knew that Nortel would shortly install new bonus compensation

programs for the executive and management employees at Nortel, which would be based on Nortel's return to profitability.  To position themselves to be certain they could cash in on such programs, during 2001-2002, as Nortel was reporting large losses – $27.3 billion in 2001 and $3.6 billion in 2002 – they caused Nortel to take hundreds of millions of dollars of ***excessive loss reserves (accruals)*** for various items, including doubtful accounts receivable and excessive goodwill write-offs and restructuring costs, knowing that since Nortel was going to be reporting extremely large losses anyway during 2001-2002, increasing those losses with even a billion dollars of excessive reserves would have no material impact on Nortel's already impaired financial condition and greatly depressed stock price.  However, by creating these hundreds of millions of dollars of "cookie jar" reserves, *i.e.*, reserves that were much larger than justified or called for by Nortel's actual financial and business conditions at the time they were taken, Dunn and Beatty and Nortel's other executives had created for themselves a huge secret reservoir which they could later draw down upon, if necessary, to create or boost future reported profits to make it appear that Nortel had returned to profitability or achieved other financial targets, triggering their entitlement to millions of dollars of bonuses.  Inside Nortel, among its top executives, these excess reserves were known as "hardness."

26.    Thus, during 2002, Nortel's top executives and directors crafted and put into place (***without shareholder approval***) new bonus compensation plans for Nortel's top executives and managers.  One plan was known as the "Return to Profitability Program," under which Nortel's executives and managers were to receive large bonuses if Nortel returned to operating (pro forma) profitability for even one quarter and even larger incremental bonuses if that profitability could be sustained for four quarters, ***provided that the return to profitability took place prior to the beginning of 2004***!  Another new plan – for the very top executives – also provided for even larger bonuses for them if Nortel achieved certain sales growth and profitability during 2003.

27.     Nortel's Board of Directors ("Board") knew or recklessly disregarded that these highly unusual bonus compensation plans created strong, indeed perverse, incentives and the opportunity for Nortel's top executives to manipulate and falsify Nortel's financial results during 2003 to create profits to trigger huge bonus payments to themselves, including by drawing down on previously established excessive reserves.  Yet the Board took no action to safeguard against such abuse or to even test or evaluate Nortel's existing internal accounting and financial controls to determine if they were sufficient to prevent such abuse.

28.     After the 2001-2002 collapse of Nortel and the severe criticism that collapse brought on Nortel's Board, the Board was anxious to restore Nortel's credibility with Nortel's shareholders and the investment community and to assure them that Nortel was a company with integrity, that was honest and that obeyed the law.  In early 2003, Nortel's top executives and directors issued Nortel's 2002 Annual Report to Shareholders.  It contained a "Message From The Chairman," signed by L.R. Wilson, which stated:

**Looking Forward**

*       *       *

We move ahead in a business environment still coming to terms with corporate scandals that highlighted the need for high standards of ethical business behavior.  One result has been intense public scrutiny of corporate governance issues and of the role of boards of directors.  New rules and regulations are being implemented in many countries.

**A Company of Best Practices**

*       *       *

Nortel Networks has always strived to be a "best practices" company.  We have a tradition of maintaining a strong system of governance within which the board and management can address their respective responsibilities.  This is a structure designed to enhance ... appropriate monitoring of compliance and performance within a framework of solid corporate values.

... Our directors are people of objectivity, high values, business acumen, and sound judgment who provide wise counsel and harness their talents to pursue the objectives of the company.  They act with integrity ....

\*         \*         \*

We communicate with our shareholders in a variety of ways, including quarterly reports [and] the annual report ....  ***At all times, we try to state things as candidly ... as possible to help investors understand the company's business*** ....

29.     The letter to shareholders also stated:

On behalf of the board, I can assure everyone with a stake in our future that the directors will continue exercising diligent oversight of the business affairs of the corporation, working with Frank Dunn and his team as they carry out their strategy to restore profitability and confidence in our company in the year ahead.

30.     The 2002 Annual Report also contained a letter signed by CEO Dunn, which stated:

We've set several priorities for the year ahead.  Our number one priority is continued improvement in our financial model.  We're looking to manage for profitability ....

We'll do so guided by our corporate values ... guiding how we do business and behave as a company....  ***[A]lways acting with integrity*** ....

Elsewhere, the 2002 Annual Report stated:

***Integrity ... underpins everything*** ....

***We are honest and obey all applicable laws....***

31.     During 2002, it was obvious to Nortel's top executives and directors that Nortel would not achieve operating profitability during 2002 and was very unlikely to do so during 2003, which meant that the executives and managers would not be able to cash in on the new executive/management bonus programs they had gotten Nortel's directors to put in place.  However, in early 2003, Nortel surprised its shareholders, the investment community and securities analysts ***when it reported a return to profitability in the very first quarter of 2003***, reporting operating earnings of $54 million, or $.01 per share!  Nortel then achieved a pro forma operating profit in the second quarter of 2003 and reported larger-than-anticipated profits for both the third and fourth

quarters of 2003, yielding a claimed 2003 profit of $732 million, or $.17 per share!  These unexpectedly strong 2003 results were very impressive to analysts.  During one conference call, Wojtek Uzdelewicz, a senior managing director at Bear Stearns said:  "*Really good numbers .... Great execution.  The numbers look really good*."

32.     In October of 2003, Nortel announced that it would restate its financial results for 2000, 2001, 2002, and part of 2003, as a result of a comprehensive review of the Company's prior accounting.  The restatement was presented by the Company as not being a negative event or an indicator of any problems at the Company.  The restatement was presented as eliminating some $900 million in liabilities, which would *reduce* Nortel's previously reported net losses for 2001 and 2002, and *increase* Nortel's shareholders' equity and net assets.  With the filing of those restated results with the SEC in December of 2003, the Company appeared to be turning yet another page, the final page perhaps on its recent scandal-plagued past.  The good news continued into January of 2004, when Nortel posted results for the fourth quarter of 2003 that far surpassed analysts' expectations.

33.     During 2003, Nortel's stock skyrocketed to over $11.50 per share based on these positive results – *which enabled Nortel to regain its status as the Company with the largest stock market capitalization in Canada*, resulting in media and analyst praise for the Dunn/Beatty management team and the apparent recovery of Nortel they had brought about.  These surprisingly strong and profitable 2003 results also triggered the payment of *hundreds of millions of dollars of bonuses to Nortel executives and managers, perhaps as much as $500 million*, the payment of which the Board approved and some of which (to the very top executives) the Board ordered be paid in cash, rather than shares of restricted stock which had been the original intention and prior practice.  In fact, Nortel admitted that its cash balance as of March 31, 2004, fell to $3.6 billion from $4 billion on December 31, 2003, "primarily due to payments made in the first quarter of 2004 under the

- 16 -

Nortel Networks employee incentive compensation plans."  This switch to cash was made because the insiders knew that Nortel had been falsifying its financial results during 2003 (and earlier), that the activities surrounding the October 2003 restatement had uncovered other financial manipulations going back to 2000, and that if, as, and when these items came to light, as they knew they likely would, Nortel's stock would plummet in price.

34.     In reality, Nortel's profitable 2003 results and the 2003 recovery in its stock price were, like Nortel's purported 2000 profitability which drove the stock to $87 per share, an illusion created by Nortel insiders' false statements and accounting manipulations.  Nortel's executives and its Board have not yet revealed how Nortel's 2003 profits were faked.  ***As a result, financial analysts have dubbed the Company "No-Tell Nortel".***  Nortel's top executives and directors have admitted the internal review of Nortel's financial irregularities is focusing on "management's practices regarding accruals and provisions."  This refers to "cookie-jar" reserves, *i.e.*, "hardness."  The way this trick works is that insiders set up excess provisions for liabilities on the balance sheet for future expenses that they do not really expect to incur.  Then they dip into the cookie jar during later periods and draw on the reserves to create the appearance of profit.  It is just a big paper shuffle.  Nortel's top executives faked Nortel's 2003 profits in at least the following ways:

- Reserves for accounts receivable:  This is the balance-sheet account that companies set up to estimate how much of their customers' bills will go unpaid.  Normally, these provisions fluctuate roughly in tandem with receivables, or money that customers owe the company.  In 2003, Nortel's gross receivables remained basically flat at $2.62 billion.  But the top executives cut its reserves for doubtful accounts by more than half, to $256 million from $517 million, boosting earnings.  The cut was way too large and boosted reported operating margins and profits.

- Inventory reserves:  Many Wall Street analysts cheered in January when Nortel said its gross profit – revenue minus the cost of goods sold – soared 22% to $4.61 billion in 2003.  On a percentage basis, gross profits margins were an astonishing 47% in 2003, up from 35.7% in 2002.  However, Nortel had taken excessive inventory write-offs in 2002, artificially lowering the costs of goods sold in 2003 and thus boosting margins.  At the end of 2001, Nortel's inventory reserves were equal to 31% of gross

inventory.  By the end of 2002, they were 52%.  Nortel did not release comparable year-end 2003 reserve figures.

- Other long-term assets:  This item on Nortel's balance sheet includes long-term customer receivables.  Nortel slashed its allowance for doubtful accounts last year to $288 million from $736 million.  As a percentage of the gross, the allowance fell to 35% of other long-term assets in 2003 from 45% a year earlier.

35.    Defendants' scheme began to unravel in mid-March 2004, when Nortel suddenly revealed a delay in filing its 2003 annual report with the SEC, and that it would likely need to restate its results for the second time in less than six months for 2003.  At first, Beatty (Nortel's CFO) and Gollogly (Nortel's Controller) were put on leave.  Then, in April 2004, Nortel **fired** Dunn, Beatty and Gollogly **for cause** and disclosed that its impending restatement would be larger than previously announced and would now cover all of 2003, as well as 2001-2002, and that Nortel's profits for 2003 were no more than half of what had previously been reported.  ***Nortel has subsequently announced that none of its financial statements or reports for the years 2000-2003 can be relied upon and will all have to be restated and that not only were its first half 2003 reported profits really losses, but now its second half 2003 results were under suspicion as well***.  Nortel then also ousted four more executives – James Kinney of Wireless Networks, Ken Taylor of Enterprise Networks, Craig Johnson of Wireline Networks and Doug Hamilton of Optical Networks – all of them Vice Presidents of the Company and the CFOs of their respective divisions.

36.    Now, Nortel is not only not able to file its 2003 Report on Form 10-K with the SEC, but it is also now unable to produce accurate financial results for the first or second quarters of 2004.  Nortel has also now postponed its 2004 shareholders' meeting indefinitely and has announced that accurate financial figures for 2001-2003 will not be available until December 2004!

37.    As a result of these shocking revelations, Nortel's stock has collapsed from over $8 to as low as $3.23 per share and the Company again finds itself again embroiled in a huge financial and

accounting scandal which has again scarred its business reputation and goodwill and created concern in the business community for the viability and survivability of the enterprise.

38.     The DOJ and the SEC are now both  conducting investigations into the events surrounding the falsification of Nortel's financial statements over the past several years.  Nortel has again been sued in huge securities class action suits for violations of U.S. securities laws on behalf of purchasers of its stock between April 24, 2003 and April 27, 2004 (hereinafter "*Nortel II*"), pending here in the United States District Court for the Southern District of New York.  And Nortel has again been sued in a huge class action suit on behalf of Nortel employees for violations of ERISA in connection with the events of 2003-2004.

39.     The rise and collapse of Nortel's stock during 2003-2004 is displayed below:



**Nortel Networks**
August 1, 2003 - May 18, 2004
Daily Share Prices

40.     The result of Nortel's 2000-2004 fiasco has been one of the most shocking exposures of fraud, deception, mismanagement, unjust enrichment and failed directorial oversight in history. Defrauded investors and employees have sued Nortel in massive class action suits in the U.S. which will cost many millions of dollars to defend and expose Nortel to billions of dollars of liability.  In addition, Nortel is subject to governmental and regulatory investigations, including investigations by the SEC and the DOJ, which will cost millions of dollars to defend and will ultimately result in large fines and/or penalties.  The credit rating agencies – Standard & Poor's, Fitch and Moody's – have all downgraded Nortel's credit rating.  Also because of the damage to Nortel's reputation and goodwill, its stock trades at a substantial discount to the stocks of its peer group competitor companies and is likely to suffer from what is known as the "*liar's discount*" going forward.  According to William Dimma, a director of several Canadian companies, "'*[t]his is a black eye, no question .... It's pretty devastating to those who are concerned about good governance*.'"

41.     In June 2004, a Lehman Brothers securities analyst wrote:

> The risk to Nortel's business and its stock price from this group of issues is the hardest to quantify but might be, in our opinion, the longest lasting.  At a minimum, investors should be prepared to see Nortel Networks in headlines of stories that include shareholder lawsuits, securities exchange commission investigations, and possibly even grand jury indictments....  *[T]hese negative headlines are likely to persist for the next few years*.

> \*       \*       \*

> Perhaps most important is the intangible impact that the series of negative events over the past nine months and the increasing uncertainty will have on Nortel management's credibility.  In our view, there is almost no way that all the management, financial disclosure, legal, regulatory, and business model questions can be answered during any but the most patient investor's time horizon.  Nortel is likely to have at least a few clouds hanging over it for the foreseeable future, and therefore its stock price is likely to remain under pressure.

42.     In June 2004, a securities analyst at A.G. Edwards, wrote:

> Nortel shareholders have endured considerable bumps and bruises over the past few years.  Unfortunately, we cannot say that the worst is over....  *With no access to*

***accurate financial statements, the firing of several key executives for cause, an ongoing SEC and OSC investigation, in a highly corrosive industry, in our opinion it is hard to build a defensible rationale for acquiring NT shares***.

43.     While Nortel and its public shareholders have suffered great damage due to the deceit and deception and breaches of duty by Nortel's insiders and the oversight failings by Nortel's Board, the insiders and directors of Nortel have ***profited from their participation in the illegal conduct***. The managers of Nortel pocketed hundreds of millions of dollars of salaries and bonuses during 2000-2004 which would have been denied them had the truth been disclosed.  On May 6, 2004, the *Toronto Star* reported:

> Even more unsettling, after some financial prestidigitation that somehow involved reserves becoming impressive profits, roughly $500 million was handed out to Nortel employees as bonuses:  rewards for such an impressive performance.  Of that $21 million went to 40-odd managers.  Frank Dunn, the fired CEO, received $2.15 million.

44.     The few Nortel executives who have been put out as scapegoats by the Board over the past few years, wishing to cover up their own participation and wrongdoing, have left with millions of dollars of unjustly obtained compensation, bonuses and severance payments – in effect, "hush" money to hew to the Nortel party line and not "tell" on the directors.  During 2000, several top Nortel executives exercised cheap stock options and sold millions of dollars worth of Nortel stock at artificially inflated prices to take advantage of their fraudulent misconduct, thus profiting by misappropriating material, non-public corporate information for their own personal profit.  As a result of their continuing concealments and cover-up, the directors of Nortel have held onto their positions of power, prestige and profit at the Company.  These directors have not only avoided the exposure of their own complicity in the wrongdoing at Nortel, but have also continued in their prestigious and profitable positions as directors, enjoying the emoluments of their offices.

45.     While in 2004 the Nortel Board has again been forced to oust its current executive team as detailed above, once again the Nortel Board is continuing the cover-up of its own

incompetence, mismanagement and complicity in the course of wrongdoing at Nortel. They have designated as Nortel's new CEO William Owens, who has served on the Board of Directors of Nortel since February 2002 and thus is personally implicated in the 2002-2004 wrongdoing. Owens, as a member of the Joint Leadership Resources Committee (*i.e.*, Compensation Committee) of the Nortel Board, not only voted to put into place the improvident Return to Profitability and other Bonus Programs in 2002, he also failed to properly oversee the program to make sure the executives did not falsify Nortel's financial results to trigger the bonus payments, and he also authorized the payment of hundreds of millions of dollars under those programs to Nortel's management team and executives under extremely dubious circumstances, including substituting cash for restricted stock units for Nortel's top executives in early 2003, just before the 2004 scandal at Nortel erupted and its stock cratered. Thus, Owens has a vested interest to protect himself and his fellow Board members from scrutiny or legal responsibility for these events and, to that end, has refused to allow Nortel to take any action to recover the illegal bonus payments, including those based on the false 2003 profits, and has actually defended those payments, stating: "***Our people were working very hard and deserved some sense of reward.***" Owens is also a former high-ranking U.S. military officer who worked in the Pentagon ***directly*** under Frank Carlucci, who was ***the Chairman of Nortel during 1999-2000, when the wrongdoing during those years occurred***, when Carlucci was Secretary of Defense. Owens is a close personal friend of – and determined to protect – Carlucci, who arranged for Owens to succeed him as Chairman of Nortel, in part so Owens could protect him from being implicated in or held accountable for his role in the 1999-2000 wrongdoing.

46.     The current Chairman of Nortel's Board remains Lynton "Red" Wilson, who has been a director of Nortel since 1991 and a member of its Executive Committee and its Chairman since April 2001, and thus is also personally implicated in the years-long course of wrongdoing at Nortel

detailed herein.  Wilson also served as Chairman of the Nortel Committee on Directors (which selects directors and makes committee assignments) since 1997 and served on the Compensation Committee since 1997.  Wilson is also the former Chairman and CEO of BCE, Inc., which was Nortel's majority shareholder until its 1998 acquisition of Bay Networks and with whom Nortel had an exclusive supply contract until 1994 and with whom Nortel had shared management until 1976.  By virtue of its domination and control over Nortel, BCE was permitted to hand-select many of Nortel's executives and directors and with whom numerous current and past Nortel directors and officers served and continue to serve in various executive capacities, including Richard Currie, current Chairman.

47.     Nortel's new CFO is William Kerr, who joined Nortel in 1994 as Controller and over the next seven years held a number of senior positions in Nortel's financial department, including senior vice-president finance and treasurer.  Nortel's new controller, Mary Anne Pahapill, has worked at Nortel in its financial department as assistant controller for years.  Thus, both these top financial officers have been involved in the years-long course of financial manipulation and wrongdoing at Nortel, and they both shared in the proceeds from the illegal and wasteful Return to Profitability bonus program.

48.     Because the stock of Nortel is registered with the SEC, trades in the United States and is listed on the New York Stock Exchange ("NYSE"), Nortel is subject to U.S. securities laws.  Via the Sarbanes-Oxley Act of 2002, the U.S. Congress mandated that public companies, including a foreign incorporated company like Nortel, that is subject to SEC regulation take action to increase and then maintain the increased effectiveness of their internal disclosure, financial and accounting controls to prevent misstated financial information, fraudulent conduct and the waste of corporate assets.  These requirements are ***unique in all the world*** and reflect a unique policy of the United

States regarding public companies subject to our securities laws and were intended to improve corporate governance, to decrease the possibility of directorial or management misconduct, thus increasing management accountability, while safeguarding corporate assets and shareholder value.

49.     On March 10, 2003, Dunn, as President and CEO, and Beatty, as Chief Financial Officer of Nortel, as required by the laws of the United States, signed and filed false certifications on behalf of themselves and Nortel with the SEC relating to Nortel's Form 10-K for 2002, which stated that the report was truthful, the financial statements in it were accurate, Nortel's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.  With respect to each of Nortel's first, second and third quarter 2003 results as filed with the SEC, as required by the laws of the United States, Dunn and Beatty signed similar certifications required by Sarbanes-Oxley.  Each of these certifications was false as the financial statements were false and Nortel's internal disclosure and accounting controls were ill-designed, had not been tested and were not effective.

50.     Nortel's top executives and directors during 2000-2003 deliberately or recklessly allowed Nortel's internal and financial controls to be deficient and defective.  Prior and subsequent to the enactment of Sarbanes-Oxley, Nortel's internal controls were grossly insufficient to assure compliance with GAAP, assure truthful and full disclosure by Nortel to its shareholders or investors and to protect and avoid the waste of Nortel's assets.

51.     The fraudulent manipulation and inflation of Nortel's profits during 2003 was only possible because of gross deficiencies in Nortel's internal financial, disclosure and accounting controls, which Nortel's top executives and directors knew or recklessly disregarded were in clear violation of the Sarbanes-Oxley Act of 2002.  Nortel has, in fact, now admitted that there are "***material weakness in internal control***" and "***a 'lack of compliance with established Nortel***

*Networks procedures for monitoring and adjusting balances relating to certain accruals and provisions, including restructuring charges*,"' as well as '"*a lack of compliance with established Nortel Networks procedures for appropriately applying generally accepted accounting principles to the initial recording of certain liabilities*.'"

52.      As a result of the personal involvement of virtually all of the current directors of Nortel in the alleged wrongdoing and the domination of the business and affairs of the Company by the current Chairman, CEO and CFO of Nortel who are directly and personally implicated in the 2000-2003 wrongdoing, the Nortel Board will not, as it has not to date, take action to sue Nortel's present and former Board members and top executives, including themselves, in an attempt to remedy the huge damage defendants' misconduct has inflicted upon Nortel.

53.      Because the directors and officers of this public Company were personally involved in or aware of the alleged wrongdoing and illegal violations, demand on them to take appropriate legal action to protect the Company and its shareholder community is futile.  The directors will never sue themselves.  In part, this is because were they to do so, such a lawsuit would trigger the "insured vs. insured" exclusion in the directors' and officers' liability insurance policies covering them as Nortel officers and directors, *exposing them to billions of dollars of uninsured personal liability*. Under such circumstances, any request or demand from the directors of this Company to institute this legal action would be futile and is thus excused, so that this derivative action brought by shareholders of a public company may proceed, if, as and when permitted to do so by this Court.

54.      Thus, the named plaintiffs, shareholders of this public Company  – have come together to sue the past and current directors and officers of the Company named as defendants herein for their illegal conduct in connection with this disaster.  This suit – pursued derivatively – seeks to obtain legal and equitable relief in the form of monetary damages, injunctive relief, and

corporate governance changes to not only compensate for this wrongdoing, but also protect this public Company and its shareholder community from a recurrence of such defalcations in the future.

# JURISDICTION AND VENUE

55.     Nortel does billions of dollars of business in the U.S. each year.  It maintains several offices here.  Nortel's stock is listed and traded on the NYSE.  Nortel files periodic reports with and is subject to the jurisdiction of the SEC and thus the U.S. federal securities laws.  Many thousands of Nortel shareholders who own hundreds of millions of shares of Nortel stock reside in the U.S. Nortel is being sued in class action suits for violation of the U.S. securities laws in this district and the U.S. ERISA statute elsewhere in the U.S. in connection with the actions of its executives and directors to falsify Nortel's financial statements during 2000-2003.  This suit is brought here, in part, due to the involvement of violations of the U.S. federal securities laws in this case, including Sarbanes-Oxley, and because prosecuting this case in this district will provide the opportunity for coordinated discovery with other related cases pending in this district, thus affording all parties the opportunity to achieve economies and efficiencies in the conduct of these litigations.

56.     A majority of Nortel's outstanding shares are owned by U.S. investors, many of which reside in this district.  More shares of Nortel stock trade on the NYSE than any other exchange.  Nortel files periodic reports with the SEC, which are authorized by the directors of Nortel.  Nortel does more business in and obtains more revenue from the U.S. than any other country.  Both Nortel and its officers and directors are subject to the unique requirements of the Sarbanes-Oxley Act, which was enacted by the U.S. Congress in 2002 to try to halt or avoid the kind of misconduct alleged here.

57.     Named plaintiff Wen gave 14 days' written notice to the directors of Nortel of intent to file this suit which would allege to a court that the current Board of Nortel is unwilling to bring

this suit and incapable of prosecuting this suit diligently and to thus obtain court authorization to prosecute this action derivatively.

58.     Each Individual Defendant has minimum contacts with the U.S., as they either reside here or have frequently traveled here on Nortel business and otherwise or authorized acts and actions which have had a sufficient impact in the U.S. or on Nortel's shareholders and investors residing here as to justify the exercise of jurisdiction over them. The amount in controversy – millions and millions of dollars – is in excess of the jurisdictional minimum of this Court. All the plaintiffs are citizens and residents of States in the United States different from defendants, some of whom are foreign citizens. Complete diversity of citizenship is present. Jurisdiction exists under 28 U.S.C. §1332.

# THE PARTIES

**The Plaintiffs**

59.     (a)  Plaintiff Locals 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust is a stockholder of Nortel. This plaintiff is a resident and citizen of the states where its Trustees reside, which does not include any state in which a named defendant resides or is a citizen of. This plaintiff currently owns over 254,000 shares of Nortel.

(b)     Plaintiff Indiana Electrical Workers Pension Trust Fund IBEW is a stockholder of Nortel. This plaintiff is a resident and citizen of the states where its Trustees reside, which does not include any state in which a named defendant resides or is a citizen of. This plaintiff currently owns over 6,800 shares of Nortel.

(c)     Plaintiff Dong Wen is a stockholder of Nortel. This plaintiff is a resident and citizen of New Jersey. This plaintiff currently owns 2,140 shares of Nortel.

**The Defendants**

60.    (a)    Nominal Party Nortel Networks Corporation ("Nortel") is a Canadian corporation which has common stock trading on the NYSE.  For most of this century, Nortel's majority and controlling shareholder was BCE Inc. ("BCE"), Canada's largest telecommunications company.  Nortel was then called "Northern Telecom."  The Company was BCE's exclusive supplier pursuant to an agreement until 1994, when exclusivity was terminated and Nortel did not have an independent management structure from BCE until 1974.  BCE's ownership of Nortel did not fall below 50% until Nortel's 1998 stock purchase of  Bay Networks, which diluted BCE's ownership interest to below 50%.   By May 2000, BCE's interest in Nortel had been further diminished to 35%.  Current Nortel Chairman Wilson previously served as BCE's chairman from 1998-2000.  On May 1, 2000, BCE spun-off all but 2% of its interest in Nortel to its own shareholders in a court-supervised "plan of arrangement," between Nortel Networks Corporation, Nortel Networks Limited (previously known as Nortel Networks Corporation) and BCE Inc., such that following the transaction:

- The Company changed its name to Nortel Networks Corporation.

- The holders of the outstanding publicly traded common shares of Nortel Networks Limited became common shareholders of the Company.

- Common shares of the Company were distributed to the common shareholders of BCE.

- Nortel Networks Limited became the principal operating subsidiary of the Company.

- Each of Nortel Networks Limited and Nortel Networks Corporation empaneled and maintained separate Boards of Directors.

- The Company assumed Nortel Networks Limited's financial reporting history as of May 1, 2000 for financial reporting purposes.  As a result, in all financial filings made thereafter, management deemed Nortel Networks Limited's consolidated business activities prior to May 1, 2000 to represent the Company's consolidated

business activities as if the Company and Nortel Networks Limited had historically been the same entity.

(b)     The Board of Directors of Nortel is, under Nortel's corporate structure, directly and intimately involved in the oversight of Nortel's business.  The following describes how the Board of Directors of Nortel operates:

- The Board is responsible for supervising the management of the business and affairs of Nortel.  The Board receives periodic presentations on the business of Nortel, as well as the industry and competitive environment in which it operates.  The Board reviews, discusses and approves matters related to the corporation's operations and strategic direction to ensure that the best interests of the corporation and its shareholders are served.

- The duties of the Board include the adopting of a strategic planning process that involves the review of strategic business plans, the approval of the annual operating budget and the approval of capital expenditures, acquisitions, dispositions, investments, and financings.

- The Board and its audit committee identify the principal risks of the business of the Company and ensure the implementation of appropriate systems to manage such risks.

- The Board is responsible for appointing and monitoring the performance of senior executives.  The Board reviews and assesses the performance of the chief executive officer and all other key members of senior management, as well as the quality and effectiveness of the senior management team.

- Nortel communicates regularly with shareholders through press releases, as well as annual and quarterly reports.  The communications of Nortel is controlled by the Board.  It provides that communications will be made in a timely, accurate and effective manner.  The Board, with the assistance of the audit committee, where appropriate, also approves the contents of major disclosure documents.

- The Board and the audit committee are responsible for the supervision of the reliability and integrity of the accounting principles and practices, financial reporting and disclosure practices followed by management.  The audit committee is responsible for ensuring an adequate system of internal controls and maintains practices and processes to assure compliance with applicable laws.

- Management is required to report regularly to the Board in a comprehensive, accurate and timely fashion on the business and affairs of the corporation.

(c)      The Customer Finance Committee of Nortel's Board is responsible for reviewing customer financings provided by Nortel, reporting on such matters to the Board and making recommendations for approval by the Board with respect thereto.

(d)      The Audit Committee of Nortel's Board is responsible for oversight of the reliability and integrity of the accounting principles and practices, financial reporting, and disclosure practices followed by Nortel.  The Audit Committee also has oversight responsibility to ensure that Nortel has established adequate systems of internal controls and maintains practices and processes to ensure compliance with applicable laws, including Sarbanes-Oxley.

(e)      The Board of Directors of Nortel held 17, 14, 24 and 30 meetings in 1999, 2000, 2001 and 2002, respectively.  The committees of the Board of Directors of Nortel include:

- The Nortel Audit Committee (which held 5, 2, 10 and 15 meetings in 1999, 2000, 2001 and 2002, respectively).

- The Nortel Executive Committee (which held 3, 2, 1 and 0 meetings in 1999, 2000, 2001 and 2002, respectively).

- The Nortel Joint Leadership Resources Committee (*i.e.*, Compensation) (which held 9, 8, and 11 meetings in 2000, 2001 and 2002, respectively).

(f)      In the Spring of 2002, Nortel's Board approved new executive and management bonus compensation programs.  This included a "Return to Profitability" bonus program and a related but even more lucrative program for Nortel's very top executives.  For the purposes of this program, "profitability" was defined as pro forma earnings, *i.e.*, goodwill, from continuing operations (which excludes acquisition related costs and certain other items of a non-operational nature), as reported by Nortel in its earnings press releases for the applicable quarters, ***on a cumulative basis***.  Under the "Return to Profitability" program, special cash bonuses were payable if and when Nortel first achieved profitability for a single fiscal quarter, ***provided that this was achieved by the end of 2003***, while the special program for top executives worked in the same

- 30 -

manner.  The key was that for Nortel's executives and managers to pocket millions in bonuses Nortel *had to achieve profitability in 2003*!

(g)       With respect to senior employees, including executive officers, the special cash bonus under the "Return to Profitability" program was to be in an aggregate potential amount, based on a multiple of base salary, to be determined by the Board.  For each such senior employee, the first portion, in an amount up to 20 % of the aggregate potential amount, was to be payable if and when Nortel first achieved profitability for a single fiscal quarter, *provided that this was achieved by the end of 2003*.  The second portion, in an amount up to 40% of the aggregate potential amount, was to be payable if and when Nortel achieved and maintained profitability for two consecutive fiscal quarters on a cumulative basis.  The third and final portion, in an amount up to 40% of the aggregate potential amount, was to be payable if and when Nortel achieved and maintained profitability for *four consecutive fiscal quarters on a cumulative basis*.  In addition, if the first portion did not become payable (as a result of not achieving profitability for a single fiscal quarter by the end of 2003), then none of the second or third portions of the bonus would be payable!

61.    (a)       Defendant James J. Blanchard ("Blanchard") is a resident and citizen of Michigan.  He has been a director of Nortel since May 1997.  He has served on the Customer Finance Committee of Nortel's Board since 1998 and on its Audit Committee from 1997-1999.  Blanchard has been a partner in the law firm of Piper Rudnick since October 2002 and prior thereto was a shareholder in the law firm of Verner, Liipfert, Bernhard, McPherson & Hand since April 1996.  Piper Rudnick provided substantial legal services to the Company in 2002 and 2003.  Blanchard is neither independent nor disinterested.

(b)       Defendant Robert E. Brown ("Brown") is a citizen of Canada.  He has been a director of Nortel since March 2000.  He has served on the Audit, Compensation, Executive, Pension

Fund Policy and Customer Finance Committees of Nortel's Board during 2000-2004.  Brown is neither independent nor disinterested.

(c)     Defendant John E. Cleghorn ("Cleghorn") is a citizen of  Canada.  He has been a director of Nortel since May 2001.  He has served as Chairman of Nortel's Audit Committee since 2002, served on its Customer Finance Committee in 2001 and on its Executive and Pension Fund Policy Committees in 2003.  Cleghorn is neither independent nor disinterested.

(d)     Defendant Frank A. Dunn ("Dunn") is a citizen of Canada.  He became a director of Nortel in March 2000, was on the Pension Fund Committee in 2000 and 2001, and, after he became CEO, was on the Executive Committee.  Dunn became the President and CEO of Nortel in November 2001.  Dunn was CFO of the Company during 2000 through July 2002.  Dunn was Senior Vice-President and CFO of Nortel from February 1999 to January 2000.  Dunn was fired on April 28, 2004.  Dunn is neither independent nor disinterested.

(e)     Defendant L. Yves Fortier ("Fortier") is a citizen of Canada.  He has been a director of Nortel since April 1992.  He has served on the Audit, Compensation, Pension Fund Policy, Customer Finance Nominating and Executive Committees of Nortel's Board during 1999-2004.  Fortier is neither independent nor disinterested.

(f)     Defendant Robert A. Ingram ("Ingram") is a resident and citizen of North Carolina.  He has been a director of Nortel since April 1999.  He has served on the Audit, Executive, Nominating and Compensation of Nortel's Board during 1999 and 2000 and the Customer Finance Committee during 1999-2004.  Ingram is neither independent nor disinterested.

(g)     William A. Owens ("Owens") is a resident and citizen of the State of Washington.  He is not named as a defendant, despite his active and knowing participation in the alleged wrongdoing, in order to preserve diversity jurisdiction.  He has been a director of Nortel

since February 2002 and a member of the Customer Finance, Compensation and Pension Fund Policy Committees during 2002-2004. Owens served from 1988-1989 as senior military assistant to defendant Carlucci who served as U.S. Defense Secretary from 1987-1989. Carlucci, who served as Chairman of Nortel from 2000-2001, had Owens appointed to the Nortel Board in 2002. Owens became CEO of Nortel on April 28, 2004, when Dunn was fired. Owens is neither independent nor disinterested.

(h)     Defendant Guylaine Saucier ("Saucier") is a citizen of Canada. She has been a director of Nortel since May 1997. She was Chair of the Joint Committee on Corporate Governance, which was established by the Canadian Institute of Chartered Accountants, the Canadian Venture Exchange, and the Toronto Stock Exchange in 2000 to review the state of corporate governance in Canada and make recommendations thereon. She was also Chair of The Canadian Institute of Chartered Accountants from June 1999 to June 2000. She has served on the Audit, Executive, Pension Fund Policy and Customer Finance Committees of Nortel's Board during 1999-2004. Saucier is neither independent nor disinterested.

(i)     Defendant Sherwood H. Smith, Jr. ("Smith") is a resident and citizen of North Carolina. He has been a director of Nortel since April 1994. He has served on the Audit, Executive, Nominating, Compensation, Customer Finance and Pension Fund Policy Committees of Nortel's Board during 1999-2004. Smith is neither independent nor disinterested.

(j)     Defendant Lynton R. Wilson ("Wilson") is a citizen of Canada. He has been a director of Nortel since April 1991 and Chairman of the Board of Nortel since April 2001. He has been Chairman of the Executive Committee during 2002-2004. Wilson also served on the Nominating, Compensation and Audit Committees during 1999-2004. Wilson served as chairman of the board of directors of Nortel's former majority shareholder, BCE, from May 1998 to April 2000,

serving in a non-executive capacity from January 1999. Wilson was Chairman and Chief Executive Officer of BCE prior thereto.  Wilson is neither independent nor disinterested.

(k)      Defendant Frank C. Carlucci ("Carlucci") is a resident and citizen of Virginia. He has been a director of Nortel since October 1989 and Chairman of the Board of Nortel from April 1999 through April 2001.  He was Chairman of the Executive Committee and a member of the Nominating, Compensation and Customer Finance Committees during 1999-2001.

(l)      Defendant Richard J. Currie ("Currie") is a citizen of Canada.  He was a director of Nortel from 1998 through 2000 and was a member of the Audit and Compensation Committees during that time period.  Currie has previously served as Nortel's Senior Vice President and CFO until 1997.  Currie has served as chairman of the board at BCE since April 2002 when Jean C. Monty resigned as Chairman and CEO, Currie having served there as a director since 1995.

(m)      Defendant Jean C. Monty ("Monty") is a citizen of Canada.  He was a director of Nortel from 1992 through 2000 and was a member of the Executive and Compensation Committees.  Monty was Vice-Chairman and Chief Executive Officer of Nortel from February 1997 to October 1997.  Monty served as Chairman and CEO of BCE until April 2002, having served as CEO since 1998 and as Chairman since 2000.

(n)      Defendant John A. Roth ("Roth") is a citizen of Canada.  He was a director of Nortel from 1996 through 2002 and was a member of the Executive Committee during 1999-2001. Roth was President and CEO of Nortel from September 1999 through November 2001.  He was put out of the Company in 2001.  Roth was Vice-Chairman and CEO of Nortel from October 1997, President and Chief Operating Officer of Nortel from February 1997, Executive Vice-President and Chief Operating Officer of Nortel from July 1996.

(o)     Defendant Douglas C. Beatty ("Beatty") is a citizen of Canada  He was Controller of Nortel from 1999 through July 2002, when he became Chief Financial Officer of Nortel until the Spring of 2004, when he was put out of the Company.

(p)     Defendant Clarence J. Chandran ("Chandran") is a citizen of North Carolina. He was the Chief Operating Officer of Nortel during 1999-2000 and through April 2001, when was forced to leave the Company.

(q)     Defendant Nicholas J. DeRoma ("DeRoma") is a citizen of Canada.  He was Nortel's Chief Legal Officer from 1999 through the current date.

(r)     Defendant Michael J. Gollogly ("Gollogly") is a citizen of either England or France.  He was the Controller of Nortel during 2002-2003 and through the Spring of 2004, when was fired.

(s)     Defendant James Kinney ("Kinney") is a citizen of Texas.  He was the Chief Financial Officer of Nortel's Wireless Networks division during 2003-2004, until he was forced to leave the Company.

(t)     Defendant Ken Taylor ("Taylor") is a citizen of North Carolina.  He was the Chief Financial Officer of Nortel's Enterprise Solutions division during 2003-2004, until he was forced to leave the Company.

(u)     Defendant Craig A. Johnson ("Johnson") is a citizen of Canada.  He was the Chief Financial Officer of Nortel's WireLine Networks division during 2003-2004, until he was forced to leave the Company.

(v)     Defendant Doug Hamilton ("Hamilton") is a citizen of Canada.  He was the Chief Financial Officer of Nortel's Optical Networks division during 2003-2004, until he was forced to leave the Company.

(w)     Defendant Malcolm K. Collins ("Collins") is a citizen of North Carolina.  He has been President of Nortel's Enterprise Networks division from 2003 to the current.

(x)     Defendant Pascal Debon ("Debon") is a citizen of Texas.  He has been President of Nortel's Wireless Networks division from 2003 to the current.

(y)     Defendant Susan L. Spradley ("Spradley") is a citizen of Texas.  She has been President of Nortel's WireLine Networks from 2003 to the present.

(z)     Defendant Gary R. Donahee ("Donahee") is a citizen of Texas.  He was Executive Vice President and President of the Americas from 1999-2003, having served in various executive positions at Nortel since 1986.

(aa)     Defendant Frank Plastina ("Plastina") is a citizen of North Carolina.  He served as President, Metro Enterprise Networks until March 2003, having served in various executive positions at Nortel since 1987.

(bb)     Defendant Brian W. McFadden ("McFadden") is a citizen of Canada.  He has been President of Nortel's Optical Networks division since 2001, having served in various executive positions at Nortel since 1979.

(cc)     Defendant Chahram Bolouri ("Bolouri") is a citizen of Canada.  He has been President of Nortel's Global Operations since 2000, having served in various executive positions at Nortel for over 20 years.

**The Directors' and Officers' Duties**

62.     Each officer and director of Nortel owed Nortel or its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Nortel's directors and officers complained of herein involves oppression and fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as directors of Nortel

and the absence of good faith on their part for their duties to the Company and its shareholders.  The misconduct of the Nortel's officers has been ratified by Nortel's Board, which has failed to take any legal action on behalf of the Company against them.

63.     By reason of their positions as officers, directors and/or fiduciaries of Nortel and because of their ability to control the business and corporate affairs of Nortel, the Individual Defendants owed Nortel and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Nortel in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Nortel and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, so as to (i) fulfill their duty of candor and honesty to the existing shareholders of Nortel; and (ii) so that the market price of Nortel's stock would be based on truthful and accurate information.

64.     The Individual Defendants, because of their positions of control and authority as directors or officers of Nortel, were able to and did, directly and indirectly, control the wrongful acts complained of herein, including Nortel's violations of the U.S. securities laws, international law, as well as the contents of the various public statements issued by the Company to its shareholders and to the investment community.  Because of their executive and directorial positions with Nortel, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, oil reserves and future business prospects of Nortel and was required to disclose it promptly and accurately to its shareholders and the financial markets but did not do so.

65.     To discharge their duties, the directors of Nortel were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Nortel.  By virtue of such duties, the officers and directors of Nortel were required, among other things, to:

(a)     Manage, conduct, supervise and direct the business affairs of Nortel in accordance with law (including the U.S. securities laws and the Sarbanes-Oxley Act), government rules and regulations and the charter and bylaws of Nortel;

(b)     Neither violate nor knowingly permit any officer, director or employee of Nortel to violate applicable laws, rules and regulations;

(c)     Remain informed as to the status of Nortel's operations, including its acquisitions and customer financing loans, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to its shareholders;

(d)     Establish and maintain systematic and accurate records and reports of the business and affairs of Nortel and procedures for the reporting of the business and affairs to the Boards of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Nortel's financial statements would be accurate and the actions of its directors would be in accordance with all applicable laws;

(f)     Exercise reasonable control and supervision over public statements to the securities markets and trading in Nortel stock by the officers and employees of Nortel; and

- 38 -

(g)     Supervise the preparation and filing of any financial reports or other information required by law from Nortel and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Nortel and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.     During all times relevant hereto, each of the defendants occupied a position with Nortel or was associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Nortel and its operations, finances and financial condition. Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding Nortel's business and finances had not been disclosed to and were being concealed from its shareholders and the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Nortel and to take any and all action necessary to ensure that the officers and directors of Nortel did not act upon such privileged non-public information in a manner which caused the Company to violate the law. Because of the Individual Defendants' positions, they knew the adverse non-public information about Nortel's operations and finances, as well as its accounting practices, markets and business prospects via access to internal corporate documents (including Nortel's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, and attendance at management and board of directors' meetings and committees thereof via reports and other information provided to them in connection therewith. Each of the Individual Defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Nortel shareholders.

# CONCERTED ACTION ALLEGATIONS

67.     Defendants schemed, pursued common courses of conduct, acted in concert with, and aided and abetted one another to accomplish the wrongs complained of herein.

# DERIVATIVE ALLEGATIONS

68.     Plaintiffs bring this action, in good faith, derivatively in the right and for the benefit of Nortel to redress damage suffered and to be suffered by Nortel as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control and fraud. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiffs will adequately and fairly represent the interests of Nortel and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.  On July 9, 2004, plaintiff Wen made a written demand on the Nortel Board to institute this action.  Over 14 days have expired since that demand was made and no action has been filed by Nortel.

69.     The Sarbanes-Oxley Act placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Nortel, to improved corporate financial, accounting and internal controls to improve corporate financial responsibility and disclosure.  This new law was a disaster for the Nortel Board, as, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive ongoing scheme to falsify its Company's reported financial results.  Any real compliance with Sarbanes-Oxley would have exposed this scheme, brought it to an end and resulted in embarrassing discharges.  Thus, the Board of Nortel did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so.  They will not sue themselves for these failures.

70.     Demand upon the Board of Nortel that they sue themselves for the damage that their misconduct has caused the Company has proved futile and useless, and it is obvious that they will not do so and they have not done so.  They have also taken steps to avoid any full and unrestricted investigation of their knowledge or participation in the scheme to inflate the profits of Nortel's financial statements and placed in overall charge of the operation of Nortel an individual who was deeply involved in the wrongdoing.  Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

71.     While Nortel and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct.  These individuals have pocketed millions and millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and the few individual officers who have been fired as scapegoats by the Board wishing to cover up their own participation and wrongdoing have left with millions and millions of dollars of illegally obtained compensation and bonuses.

72.     As a result of their concealments and falsifications, many of the directors and managers of Nortel held onto their positions of power, prestige and profit at the Company.  The managers of Nortel pocketed millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed.  The directors avoided not only the exposure and

embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest companies in the world.

73.    The Nortel Board is still dominated and controlled by wrongdoers who are covering up their own misconduct and will not take action to protect the interests of Nortel or its shareholders. The only two directors on Nortel's Board who were not personally involved in the alleged wrongdoing are John Manley and Dr. Manfred Bischoff, who were appointed to the Board in April 2004 by the existing Board (all defendants herein) after being hand-picked by Owens and Wilson for Board seats.  These non-elected directors owe their positions and allegiance to Owens and Wilson and are neither independent nor disinterested.

74.    The present Board of Directors of Nortel has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The majority of the current Board of Directors of Nortel participated in the wrongs complained of, they created and approved, authored and signed and circulated the false and misleading financial statements;

(b)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(c)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(d)    The acts complained of herein are illegal and fraudulent and thus are acts incapable of ratification;

(e)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action;

(f)     The members of the Nortel Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Nortel  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal and business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(g)     The Nortel directors' and officers' liability insurance policies for the period 2000-2004 have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

75.     Plaintiffs have not made any demand on shareholders of Nortel to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Nortel is a publicly traded company with approximately 3.8 billion shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

# EVENTS OF 1999-2001

**Nortel's Insiders' Strategy for Nortel to Grow in
Size by Acquiring Other Companies Depended upon
Maintaining a High Price for Nortel's Stock**

76.     In 1998, Nortel's top executives and directors embarked upon an acquisition strategy that was dependent upon maintaining a high stock price in order to make Nortel's shares attractive as currency to purchase other companies. In order to grow the size of Nortel to increase the perquisites of their positions of power, prestige and profit, these executives and directors made a decision to grow Nortel by acquiring other communications, Internet and Internet-related companies, paying exorbitant prices for them to boost Nortel's apparent revenues and growth prospects.  During 1999 through early 2001, in a span of just 26 months, Nortel acquired the following companies, almost all for Nortel stock:

| Company Acquired | Date |
|---|---|
| Shasta Networks, Inc. | 04/16/99 |
| X-Cel | 05/20/99 |
| Periphonics Corporation | 11/12/99 |
| Medcom USA (5.6% equity interest) | 11/18/99 |

| Company Acquired | Date |
|---|---|
| Radiotronica (5% equity interest) | 11/29/99 |
| Qtera Corporation | 12/18/99 |
| Dimension Enterprises, Inc. | 01/24/00 |
| Clarify Inc. | 03/16/00 |
| Promatory Communications, Inc. | 03/23/00 |
| Photonic Technologies, Inc. | 05/12/00 |
| Xros, Inc. | 06/02/00 |
| CoreTek, Inc. | 06/23/00 |
| Architel Systems Corporations | 07/01/00 |
| EPiCON, Inc. | 09/05/00 |
| Alteon WebSystems, Inc. | 10/05/00 |
| Sonoma Systems | 10/19/00 |
| 980 NPLC Business (JDS Uniphase Subsidiary) | 02/13/01 |

77.    Nortel's 1999-2000 acquisitions were consummated through the issuance of Nortel common stock.  It was crucial for Nortel's top executives and directors to cause Nortel to continue to meet or beat forecasted levels of revenues and growth in order to maintain Nortel's stock price at a high level, providing them with a useful currency to continue Nortel's acquisition spree.

78.    By the Spring of 2000, Nortel's top executives and directors knew the market for the technologies and products of these acquired companies had already been contracting, thereby reducing the anticipated revenues from each of the acquired companies and, consequently, reducing the value of those entities.  The overall value of and expected revenues from the acquired companies was further negatively impacted by the fact that Nortel's top executives and directors knew the

acquired products were not as fully developed as they led the markets to believe and/or the engineers of the acquired companies departed after the acquisition, leaving Nortel with partially developed products and without the engineering know-how to complete the products.

79.     Even though throughout 2000 Nortel was encountering serious, significant and persistent difficulties integrating newly acquired companies into Nortel's business, operations and internal financial and accounting control systems, Nortel's top executives and directors caused Nortel to continue its acquisition binge, desperate to add revenues to Nortel and knew that by using pro forma accounting they could mask the losses these acquisitions were really causing.  A former Nortel employee who was responsible for integrating companies that were acquired by Nortel during 2000 described the Company's integration policies as "*100 roadmaps to disaster*."  Nevertheless, in an April 26, 2000 interview with David Faber of CNBC's Squawk Box, defendant Roth dismissed the notion that the Company's acquisitions strategy was too aggressive:

> **David Faber**:  Do you worry that you might bite off more than you can chew?  Kyros, as I understand, won't start testing until this summer, and these deals have added up to $6.5 billion, just Kyros and Qtera, there's the Architel Systems all stock deal at $395 million, is it *just perhaps too much too quickly*?
>
> **John Roth**: *I don't think so*.  We have gradually increased our pace.... *[T]hey are fairly easy to digest*.

Nortel's top executives and directors caused Nortel to continue its overly aggressive acquisition campaign in the face of a deteriorating U.S. economy, resulting in its consistent overpayment for acquisitions made without adequate due diligence which led to the ultimate write-down of $12.4 billion associated with the acquisitions.

80.     As part of their cover-up scheme, during 2000 and early 2001, Nortel's top executives and directors caused Nortel to issue a series of false and misleading statements and engage in a variety of accounting manipulations that: (i) overstated Nortel's reported third quarter and year-end 2000 revenues and earnings; and (ii) falsely represented and reassured the investing public that

despite a contraction and retrenchment of the Internet and telecommunications sectors in the United

States, Nortel's strong growth, revenues and earnings trends *would continue* through 2001-2002.

They also represented that Nortel's key customer base, the Internet and telecommunications sector in

the United States, and its business model were far superior to its competitors like Cisco and Lucent

(who were suffering serious financial setbacks), that Nortel was not as vulnerable to the adverse

business conditions that were hurting its competitors, and thus *would continue to grow faster* than

the rest of the market.

**Nortel's Top Executives and Directors Caused It to Extend
Vendor Financing to Uncreditworthy Customers to
Artificially Boost Reported Revenues During 2000**

81.     During 2000, Nortel was attempting to sell to the hottest part of the "New Economy"

– the Internet Service Providers ("ISPs") and also to smaller "local exchange" telecommunications

companies, or CLECs.  These companies, however, suffered a problem common to start-ups – lack

of capital and a lack of well-thought-out or tested business plans.  Attempting to overcome this

dearth of capital and in disregard of the lack of viable business plans, Nortel's top executives and

directors caused it to directly and/or indirectly extend hundreds of millions of dollars in trade

financing ("vendor financing") to dozens of customers and prospective customers to provide them

with the funds necessary to purchase Nortel products.  Without the extension of credit and/or

infusions of cash from Nortel, these companies would not have had funds sufficient to make the

purchases of Nortel products that they did, and, in many cases, were so cash-poor that they were on

the verge of insolvency at the time Nortel extended them financing.

82.     In addition to providing financing for the purchase of its products, Nortel also made

huge unsecured "working capital" loans to these companies (often equal up to 30% of the product

purchase loans) to provide them with funding to finance their ongoing business operations, even

though these customers were unable to create or present credible business plans or any rational

- 47 -

sound repayment plan.  The top executives and directors of Nortel knew these unsecured loans did not comply with Nortel's own internal credit extension policies and carried an extremely high and unreasonable risk of loss for Nortel and were not adequately reserved for.

83.     Nortel's top executives and directors knew at the time that Nortel's products were shipped to many of these vendor-financed customers, that the customers were using 100% borrowed funds to pay for the products, that the customers posed an extremely high credit risk and that the credit would likely never be repaid.  Moreover, because Nortel loaned funds in excess of the amounts required to purchase the equipment, to the extent it was paid back, Nortel frequently was paid back with the very funds it loaned these companies for working capital purposes.  As the economy weakened throughout 2000, Nortel's vendor-financing activities became ever riskier, because, as its customers' businesses suffered, there was an increased likelihood that those customers would be unable to repay the loans – nevertheless, Nortel's top executives and directors forced Nortel to continue to make such loans.

84.     Nortel's top executives and directors continued to cause Nortel to extend large amounts of vendor financing to known high credit risks so that Nortel could book revenues from the product sales while failing to disclose these risks to Nortel's shareholders or investors.  In fact, since their primary goal was to increase Nortel's reported revenues so that the Company could meet sales projections for each quarter and they could justify larger salaries, bonuses and other perks, Nortel's top executives and directors: (i) purposefully sought to consummate financing deals with financially weakened customers so that defendants could dictate which products, and what quantities of those products, the customers would purchase; (ii) purposefully failed to perform the necessary due diligence to determine how creditworthy the customers were; and (iii) in certain instances, extended

significantly more in vendor financing than the customer had requested to lure the customer away from Nortel's competitors, such as Cisco, Lucent and Ciena.

85.     By the end of 2000, Nortel's top officers and directors had caused Nortel to extend more than $1 billion in vendor financing to dozens of companies, including, among others:

| Company | Business | Financing |
|---------|----------|-----------|
| Leap Wireless | Wireless Comm. | $525 million |
| Impsat | Satellite (Latin Amer.) | $297 million |
| Savvis | ISP | $235 million |
| Viatel | Broadband Provider | $150 million |
| Nettel | Local Access | $100 million |
| Illinois PCS | Wireless Comm. | $ 48 million |
| Tr Vergent | Local Access | $ 45 million |
| Eschelon Telecom | Local access | $ 45 million |
| Universal Broadband | ISP | $ 37 million |
| Telergy | Bandwith Wholesaler | $ 25 million |

86.     By mid-2000, many of Nortel's vendor-financed customers were already beginning to default on payments and/or face insolvency.  For example, on September 28, 2000, Nettel Corporation, a Nortel customer to which approximately $100 million in vendor-financing had been extended, filed a voluntary petition under Chapter 11 with the United States Bankruptcy Court for the District of Columbia.  At the time of the petition, Nortel was owed in excess of $73 million by Nettel.  Many other vendor-financed Nortel customers also ultimately filed for bankruptcy protection, including Viatel and Telergy.

87.     Nortel's top executives and directors had actual knowledge of the risk of loss caused by Nortel's vendor financing activities and the impaired financial condition of the Company's vendor-financed customers throughout 2000-2001 because the Nortel Board had a committee to oversee and control vendor financing and, as noted above, (i) many of those customers were already insolvent or nearly so; (ii) Nortel actively sought out financially weak companies; and (iii) Nortel maintained a list of "flagged" vendor-financed customers that were on the verge of insolvency.

88.     While Nortel's top executives and directors were consummating the improvident and wasteful vendor-financing deals in an effort to boost reported "revenues" throughout 2000, they repeatedly and falsely reassured Nortel's shareholders and investors that they were extending such financing to "blue chip" companies and that the risks involved were minimal. For example, in a November 30, 2000 interview with CNBC's Maria Bartiromo and David Faber, at a time when hundreds of millions of dollars in unduly risky credit already had been extended, Roth falsely reassured Nortel investors and shareholders with regard to the credit risk associated with Nortel's escalating vendor financing activities:

> **David Faber**: Mr. Roth, another concern in your arena for big players like your own is vendor financing.  How active are you in getting vendor financing?  Are you concerned at all about having extend[ed] credit to some emerging telecom players that may not be able to pay you back with buying [your] equipment?
>
> **John Roth**: No.  *We have got some really blue chip people we finance....  We are not concerned at all*.

89.     Through Nortel's vendor-financed sales, Nortel's top executives and directors, in violation of applicable GAAP and the U.S. federal securities laws, were able to misstate and inflate the Company's financial results reported for the third and fourth quarters of 2000 by, among other things:  (i) recording revenues on the sale of products in situations where Nortel had extended credit on 100% of the purchase price to customers whom defendants knew were not creditworthy and would likely never pay for the products; (ii) failing adequately to reserve for vendor financing loans

- 50 -

Nortel had made to uncreditworthy customers whom defendants knew would likely be unable to pay

for their purchases in whole or in substantial part; (iii) when extending vendor-financing to a

customer to purchase Nortel products, requiring the buyer to purchase, through a distributor or other

intermediary, significant additional products the buyer did not need and did not want and where the

risk of return was apparent and material; and (iv) when reclaiming possession of Nortel products

after vendor-financed customers defaulted on credit payments, failing to take a charge against

earnings to account for the fact that the value of the products had diminished substantially below

cost because they were used and, in certain cases, were rendered obsolete by new technology.

**Nortel's Top Executives and Directors Report Nortel's Third
Quarter 2000 Financial Results, Characterize the Third
Quarter as "Strong Growth" and Provide Strong Forecasts
for Year-End 2000 and 2001**

90.     On October 24, 2000, Nortel's top executives and directors reported Nortel's financial

results for the quarterly period ending September 30, 2000 to Nortel's shareholders and investors.

The Company reported third quarter revenues of $7.31 billion, up 42% from the same period in

1999.  The Company also reported net earnings from operations of $574 million, or $0.18 per share

on a diluted basis, compared to $314 million, or $0.11 per share on a diluted basis, for the same

period in 1999, "an increase in earnings per share of operations of 64 percent."  In the press release,

Roth commented positively on the reported financial results stating:

> "We are extremely pleased with the strong growth in the quarter which
> reflected our continued strength and leadership in the key growth areas of Optical
> Internet, Wireless Internet, Local Internet and eBusiness Solutions ....  Carriers and
> providers around the world continued the drive to provide a broad range of wireless,
> internet and eBusiness services to their customers.  Leading the growth again this
> quarter, revenues for our Optical Internet Solutions grew nearly 90% in the quarter
> compared to the same period last year."

91.     With respect to Nortel's expectations for growth in revenues and earnings for year-

end 2000, the Nortel release stated:

"Based on the momentum we have experienced during the first nine months and the strong order backlog, we continue to expect that our percentage revenue growth in 2000 over 1999 will be in the low 40's. Consistent with our overall expectations for the year is an expectation that Optical Internet solutions revenues will exceed US$10 billion. We now expect however, that our percentage growth in EPS from operations in 2000 compared with 1999 will also be in the low 40's, up from our previously stated expectation which was in the high 30's."

The October 24, 2000 statements also included strong forecasts with respect to the Company's growth prospects for 2001:

"Looking forward to 2001, we expect the overall market to grow in excess of 20 percent. Given our strong market position and industry leading network solutions, we expect to continue to grow significantly faster than the market, with anticipated growth in revenues and EPS from operations in the 30 to 35 percent range."

92. Only by engaging in a variety of accounting improprieties were Nortel's top executives and directors able to cause Nortel to report significant growth in revenues and earnings for the 2000 third quarter, despite the fact that the demand for Nortel's products had declined substantially during that period as a result of a contraction of the Internet and telecommunications sectors. Had Nortel's top executives and directors not engaged in these accounting manipulations, Nortel's revenues and earnings would have been much lower than what was reported. Thus, Nortel's top executives' and directors' fraudulent activities acted to conceal the impact of the significant negative market changes Nortel had experienced and the adverse impact on Nortel's business and finances resulting therefrom.

93. On November 7, 2000, Nortel's top executives and directors filed Nortel's quarterly report on Form 10-Q for the quarterly period ending September 30, 2000, reiterating the financial results detailed above and representing that the financial results were prepared in conformity with GAAP and that they fairly presented the Company's financial position. The 10-Q, signed by Dunn, also represented that: "In the opinion of management, all adjustments necessary to effect a fair

statement of the results for the periods presented have been made and all such adjustments are of a normal recurring nature."

94.     Nortel's top officers and directors knew the statements set forth above were false and misleading because they misrepresented and/or omitted the following adverse facts which then existed and the disclosure of which was necessary to make the statements made not materially misleading:

(a)     The Internet and telecommunications markets contracted significantly during the third quarter of 2000, causing Nortel to experience a substantial decline in the demand for its products;

(b)     The Company did not experience "strong growth" and "strong order backlog" in the third quarter, but rather experienced a material decline in the demand for its products;

(c)     Nortel had suffered a steady deterioration of sales and revenues in its Enterprise Solutions Group, which historically has accounted for a significant portion of the Company's business;

(d)     Nortel had received notice from several major Nortel customers that orders would continue to decline throughout the fourth quarter and into 2001;

(e)     Nortel had been warned by several customers in Nortel's High Performance Optical Group that fourth quarter orders would be materially reduced;

(f)     Nortel concealed these negative market conditions by engaging in certain accounting improprieties which acted to materially misstate the Company's third quarter results, as discussed in detail below;

(g)     As discussed below, the financial results reported for the third quarter of 2000 were materially misstated and presented in violation of GAAP;

(h)     It was only as a result of these GAAP violations, which materially cushioned the revenue and earnings miss, that Nortel was able to report substantial growth for the third quarter 2000; and

(i)     The third quarter revenue shortfall was the result of negative market conditions and a decline in the demand for Nortel's products, it was not caused by a "shortage of personnel" to install and test products, or a "delay" in orders, as Nortel's top executives and directors represented.

95.     In addition, the statements in the October 24, 2000 press release regarding expected growth in revenues and earnings for 2000 ("in the low 40's") and 2001 ("in the 30 to 35 percent range") were false and misleading because:

(a)     Nortel's top executives and directors knew or recklessly disregarded that, because of a continuing contracting market for Internet and telecommunications products, Nortel's customers would continue to reduce their orders for Nortel products throughout the fourth quarter of 2000 and into 2001;

(b)     Nortel's top executives and directors had been informed by major customers prior to the close of the 2000 third quarter that their orders in the fourth quarter and throughout 2001 would be significantly reduced;

(c)     Nortel had not experienced "continued strong growth" because Nortel's reported "growth" for the third quarter 2000 was materially inflated as a result of the accounting improprieties alleged above;

(d)     Given the change in market conditions and representations from major customers that orders in 2001 would be substantially reduced, defendants did not actually expect the overall market to grow "in excess of 20 percent" in 2001; and

(e)      Nortel's top executives' and directors' forecasts for 2001 (30%-35% revenue growth) would be nearly impossible to achieve in light of the contracting Internet and telecommunications sectors and the fact that defendants planned to improperly sacrifice a substantial portion of Nortel's 2001 revenues by pulling those revenues into 2000.

96.      Throughout the third quarter, Nortel's top executives and directors were repeatedly advised by sales representatives and managers that the sale of Nortel's products was slowing down and contracting.  For instance, in Nortel's Enterprise Solutions Group, which accounts for a significant portion of Nortel's overall business, there was a "steady deterioration" in the group's sales and revenues from July 2000 forward.

97.      In August 2000, executives at FairPoint, a Nortel "major account," informed the sales representatives, who obtained approval from Chandran on deals with FairPoint, that its business was deteriorating and that purchases in 2001 would be significantly less than in 2000.  A Field Sales Representative submitted to management by the end of the third quarter 2000 a 2001 forecast for the FairPoint account, which was revised downward substantially in light of FairPoint's weakened condition.

98.      Throughout 1999-2001, Verizon was one of Nortel's largest customers.  In September 2000, those Nortel senior executives responsible for the Verizon account, including John Neville, Vice President of Team Verizon, met to discuss sales revenues for the remainder of the year.  At that meeting, Neville, who reported to Chandran, demanded of those present that $1.1 billion in Verizon Network Services Sales be recorded for the year 2000.  At the September 2000 meeting, Neville was informed by senior sales personnel that, given the then-existing market conditions, $1.1 billion in revenues would not be possible without improperly "pulling forward" and recording hundreds of millions of dollars in revenues from 2001 through 2002    "pulling forward" is the practice of

recording and reporting revenues from the anticipated sales of products in later quarters into an earlier quarter.

99.      After consulting with people in Nortel's finance department, Neville instructed those present to pull forward into the third and fourth quarters of 2000 whatever amounts of revenues would be necessary to record $1.1 billion in 2000 revenues.  In addition, senior executives on the Verizon account informed management at the September meeting that there would be a "major shortfall" in 2001 as a result of the massive pull forward of revenues into 2000.  Moreover, in mid-2000, Nortel senior management had been informed by other major customers, including WorldCom and AT&T, that orders in 2001 would be significantly reduced.

100.      According to a former Nortel director of corporate communications, also in September 2000, Michael Fichtner, Vice President of Global Sales for Nortel's High Performance Optical Group, was warned by several of his customers that the "cash crunch" these customers were feeling as a result of the softening of the telecommunications industry would cause them to continue to reduce orders for Nortel products throughout the fourth quarter.  Based upon conversations with his customers in September 2000, Fichtner submitted to Chandran his group's fourth quarter 2000 sales forecasts, which were significantly below what was previously expected.  Chandran thereafter demanded that Fichtner do whatever was necessary to "develop bigger numbers."

**Nortel's Third Quarter 2000 Reported Financial Results Were
Misstated in Violation of GAAP and SEC Reporting Rules**

101.      The financial results reported in the October 24, 2000 press release and conference call and in the Company's third quarter 2000 Form 10-Q were materially misstated. Indeed, in order to conceal and temper the impact of the negative market changes on Nortel's business, Nortel's top executives and directors engaged in a variety of practices which caused Nortel's financial results for

- 56 -

the third quarter to be materially enhanced and misstated in violation of GAAP and SEC reporting rules.

102.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

**Improper Revenue Recognition**

103.    In the third quarter of 2000, Nortel's top executives and directors materially inflated the Company's reported revenues, earnings and earnings per share by improperly recording and reporting revenues on shipments of products when Nortel extended credit on 100% of the sales price of the product to the vendor-financed customers whom defendants knew to be uncreditworthy and unable to pay for the product.  This practice, which also artificially inflated the Company's book-to-bill ratio for the 2000 third quarter, violated GAAP in a number of respects.

104.    GAAP, as described by FASB Statement of Concepts ("Concepts") No. 5, provides that the recognition of revenue should occur only where two fundamental conditions are satisfied: the revenue has been earned and the amount is collectible.  Concepts No. 5, ¶¶83-84.  Moreover, Concepts Statement No. 5 generally provides that revenues should not be recognized until they are: (i) realized or realizable; and (ii) earned.  Concepts No. 5, ¶183.  These conditions for revenue recognition ordinarily are met when assets or services are exchanged for cash or claims to cash, and when the entity has substantially performed the obligations which entitle it to the benefits

represented by the revenue.  Concepts No. 5, ¶183.  GAAP also provides that profit is deemed to be realized when the collection of the sales price is reasonably assured.  Accounting Principles Board ("APB") Opinion No. 10, ¶112.

105.    Similarly, the SEC's Staff Accounting Bulletin ("SAB") No. 101, which sets forth the SEC Staff's views in applying GAAP to revenue recognition in financial statements, imposes the same prerequisites to the recognition of revenues as does Concepts No. 5. According to Nortel's Form 10-K for the fiscal year ended December 31, 2000, Nortel "adopted the recommendations of Staff Accounting Bulletin 101 ... effective January 1, 2000."

106.    In addition, because many of the networking systems sold to vendor-financed customers included a software component, those transactions were subject to the AICPA's Statement of Position ("SOP") 97-2 (Software Revenue Recognition).  SOP 97-2 permits the recognition of revenues from the sale of software products only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectibility is probable.  SOP 97-2 provides that "any extended payment terms in a software licensing agreement may indicate that the fee is not fixed and determinable." SOP 97-2, ¶28; *see also* SOP 97-2, ¶¶27, 29-30.

107.    In the 2000 third quarter, Nortel's top executives and directors caused it to improperly record and report hundreds of millions, if not billions, of dollars in revenues on sales to vendor-financed customers despite the fact that those customers were purchasing products based upon Nortel's extension of credit on virtually 100% of the purchase price and they likely would be financially unable to pay Nortel in full or in substantial part for the products.  Thus, the revenues from those sales were not fixed and determinable and were known to be materially uncollectible, *i.e.* collectibility was not probable.

108.    In engaging in these practices, Nortel's top executives and directors also caused Nortel to violate the Company's own internal revenue recognition policies, which, according to Nortel's Form 10-K for the fiscal year ended December 31, 2000, required that collection be "reasonably assured" prior to recognition:

> Revenues are recognized ... upon shipment and when all significant contractual obligations have been satisfied and collection is reasonably assured. Software revenues are generally recognized when delivered in accordance with all terms and conditions of the customer contracts, upon acceptance by the customer, and when collection is reasonably assured.

109.    In connection with making certain vendor-financed loans, Nortel's top executives and directors also improperly required customers to purchase significant quantities of additional product the customers informed Nortel they neither needed nor wanted, thereby materially inflating current period orders and increasing the risk of material returns.   Thus, the revenue reported was not indicative of the true demand for Nortel's products during that quarter.   This practice, which also artificially inflated the Company's book-to-bill ratio in the 2000 third quarter, violated the following fundamental accounting principles, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Concepts No. 1, ¶134);

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Concepts No. 1, ¶142); and

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Concepts No. 1, ¶¶58-59).

110.    As a further GAAP violation, in accounting for inventories with respect to reclaimed Nortel products from vendor-financed customers who had defaulted on their credit agreements with Nortel, defendants improperly failed to take a charge against earnings to account for the fact that the

market value of such products had deteriorated substantially below cost because, among other things, the products were used, prices had changed and, in some cases, the products had been rendered obsolete by new technology. Accounting Research Bulletin ("ARB") No. 43, Chapter 4, Statement 5 provides, in pertinent part:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

111.    Thus, Nortel's top executives and directors materially inflated Nortel's reported earnings for the third quarter of 2000 by failing to take a charge against earnings to reflect the fact that the value of the products re-acquired by Nortel from vendor-financed customers had diminished to a level below cost, and, in some cases, were nearly worthless.

112.    As yet another GAAP violation, Nortel's top executives and directors pulled forward hundreds of millions, if not billions, of dollars in revenues from future quarters into the third and fourth quarters of 2000. In so doing, defendants violated FASB Concepts No. 1 because they improperly inflated reported revenues for each of those particular quarters and thus the Company's financial reporting for those quarters did not reliably represent what they purported to represent. FASB Concepts No. 1, ¶¶33, 41, 58-59. In addition, defendants' practice of pulling forward revenues violated SOP 97-2 because, as in the $800 million Verizon contract discussed above, defendants recorded and reported revenues on software components of contracts which contained multiple elements, in the absence of vendor specific objective evidence as to the price of the software component, and thus the fee was not "fixed and determinable." In addition, such practices also violated SOP 97-2 and other GAAP provisions because, in certain instances, revenues were booked prior to delivery.

113.    As and for a further violation of GAAP in the 2000 third quarter, Nortel's top executives and directors improperly recognized revenues on the basis of "letters of intent" to purchase product, in lieu of formal purchase orders.  This practice violated Concepts No. 5, because the revenue was recognized before it was "earned" and because there was insufficient evidence that an "arrangement" existed.  This practice also violated SAB No. 101 (which the Company adopted effective January 1, 2000), because, prior to the fraud alleged herein, it was Nortel's customary business practice to require a formal purchase order prior to the recognition of revenues from a sale.  SAB No. 101, §2 (Persuasive Evidence of an Arrangement).  In addition, defendants' practice of recognizing revenues on the basis of letters of intent violated FASB Concepts No. 1, ¶42, because it was used to pull sales into the current quarter, thereby inflating that quarter's reported revenues.

114.    In many instances, this "risky practice" of booking revenues based upon letters of intent resulted in actual purchase orders not being submitted and the deals later collapsing, after the quarter ended.  Nortel Sales Director and the President of Nortel's eBusiness Solution approved of the use of this practice and other practices to pull revenues from future quarters into the current quarter.

115.    As yet another GAAP violation, because certain products were in short supply during the third quarter, Nortel's top executives and directors caused Nortel to ship interim or substitute products and booked revenue as though the final products had been shipped.  The substitute products were either used or demonstration products.  This practice, which former Nortel employees consistently refer to as "selling futures," violated GAAP because the revenue had not been earned as delivery had not yet occurred.  FASB Concepts No. 5, ¶84.

116.    In the third quarter of 2000, Nortel's top executives and directors also improperly recognized revenues on the sales of products to new customers prior to the expiration of the date by

which those customers were permitted to return the product.  The Financial Accounting Board Statement of Financial Accounting Standards ("SFAS") No. 48 precludes the recognition of revenues on the sale of a product before the right of return has expired, unless the "amount of future returns can be reasonably estimated" and certain other conditions are satisfied.  In particular, SFAS No. 48 provides that the following factors may impair the ability to make a reasonable estimate: (i) the susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand; and (ii) absence of historical experience with similar types of sales (*i.e.*, new customers).

117.    Nortel's top executives and directors caused Nortel to improperly recognize revenue, in violation of SFAS No. 48, because they were unable to reasonably estimate the amount of future returns since these were new Nortel customers, with no history of Nortel purchases upon which to base an estimate, and the Nortel products being sold to these new customers were susceptible to technological obsolescence.  In addition, Nortel's return policies were extremely liberal and went well beyond the customary short-term right-of-return.  One former Nortel employee recalled that the Company routinely allowed customers to return product for just about "any reason" for a period of 90 days.  With respect to products including a software component, defendants' conduct also violated SOP No. 97-2, ¶31, which provides that "[sales arrangements] cancelable by customers are neither fixed nor determinable until the cancellation privileges lapse."

**Failure to Account for Uncollectible Receivables**

118.    Nortel's third quarter 2000 reported financial results were also materially false and misleading because they failed to account for uncollectible receivables, thereby materially inflating the Company's reported assets and artificially bolstering its balance sheet.  In the second, third and fourth quarters of 2000, Nortel's top executives and directors caused Nortel to report hundreds of

millions, if not billions, of dollars in accounts receivables as valuable and collectible assets of the Company:

| Reporting Period | Reported Net Accounts Receivable | Reserve Provision for "Uncollectibles" | Total Reported Assets | % of Total Reported Assets |
|---|---|---|---|---|
| June 30, 2000 | $6.939 billion | $406 million | $34.035 billion | 20% |
| Sept. 30 2000 | $7.337 billion | $400 million | $33.903 billion | 22% |
| Dec. 31, 2000 | $8.198 billion | $400 million | $42.180 billion | 19% |

119.    As demonstrated by the chart above, Nortel's top executives and directors caused Nortel to report in excess of $7 billion in accounts receivables at the end of the third quarter of 2000, representing 20% of the Company's total reported assets.  At least as of October 24, 2000, the date of the Company's third quarter 2000 earnings release, however, these insiders knew, for the reasons set forth above, that at least a significant portion of the Company's reported receivables which existed as a result of the vendor financing practices particularized above were grossly delinquent, delayed and/or at serious risk of non-collectibility and that the Company's reserves were correspondingly inadequate.

120.    As discussed above, in addition to causing Nortel to extend hundreds of millions of dollars to uncreditworthy customers to enable them to purchase Nortel products, these insiders caused Nortel to extend massive "working capital" loans to these same customers to provide them with funds to finance their ongoing business operations.  These loans carry substantial risk because they were unsecured and the companies to which the loans were extended were experiencing a decline in their businesses as a result of significant negative market conditions.

121.    It was "common knowledge" at the corporate level that the Company had been carrying an inordinate level of known uncollectible receivables created as a result of the Company's

sustained and deliberate practice of lending substantial funds to uncreditworthy customers in order to boost reported sales of Nortel products. It was further commonly understood within the Company that these receivables, which the Company reflected as a valuable asset on its balance sheet during 2000, were greatly overvalued.

122.    Despite these facts, the Company's financial statements for the third quarter of 2000 failed to reflect this risk of noncollectibility through reserves or charges against income as required by GAAP. Instead, the Company's reported financial results for the third quarter included a mere $400 million "provision for uncollectibles." This provision, which represented a mere 5% of Nortel's accounts receivables for each reporting period, was grossly inadequate as it did not reflect the true level of uncollectible receivables on the Company's books.

123.    Indeed, while Nortel's reported accounts receivables increased from $6.939 billion at June 30, 2000 to $7.337 billion at September 30, 2000 in the face of worsening industry conditions, its reserve for uncollectible accounts actually decreased from $406 million to $400 million during that same period and remained at that level in the fourth quarter, despite worsening industry conditions.

124.    It was not until the third quarter of 2001 that Nortel's top executives and directors belatedly began to adjust significantly the Company's provision for uncollectible receivables. As stated in Nortel's Form 10-Q for the quarterly period ended September 30, 2001, filed November 6, 2001, the Company increased provisions relating to various customer receivables and financings to approximately $1.067 billion. Indeed, although the Company's reported receivables decreased during the nine months ended September 30, 2001 by approximately $4 billion, the Company increased its provisions for uncollectibles by several hundreds of millions of dollars to in excess of $1 billion. Thus, while sales were decreasing in 2001, defendants were finally adjusting the

Company's provision for uncollectible receivables to account for the abundance of bad debt the Company had amassed through risky vendor-financing activities during 1999-2000.

125.    In this regard, Nortel's top executives and directors caused the Company's financial statements during 2000 and the first half of 2001 to improperly reflect a material overstatement of receivables and earnings and under-reporting of reserves in contravention of the following GAAP provisions:

(a)    SFAS No. 5, ¶18, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.

(b)    The uncertainty that generally exists regarding the collectibility of receivables constitutes a contingency within the meaning of SFAS No. 5, ¶1. Consequently, estimated bad debt expense must be accrued if it is material, probable, and can be reasonably estimated. The degree to which receivables are impaired may be estimated on the basis of experience, analysis of individual accounts, or reference to appropriate industry averages. The very process of selling on credit, as defendants did throughout the Class Period, implies that bad debt expenses are probable.

(c)    The GAAP requirement for the inclusion of a provision for noncollectible receivables applies to interim financial statements, as indicated by APB Opinion No. 28, ¶17, *Interim Financial Reporting*:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount. ***Examples of such items include ... allowance for uncollectible accounts***.

- 65 -

(d)     According to ARB No. 43, Chapter 3, Section A, the objective of providing for reserves against receivables is to assure that "[a]ccounts receivable net of allowances for uncollectible accounts ... are effectively stated at the amount of cash estimated as realizable."

126.    Despite knowledge that each of the conditions prompting the need to take a charge against income was existent prior to the close of the third quarter of 2000,  Nortel's top executives and directors *knowingly permitted the Company's balance sheet to reflect $7.337 billion in accounts receivables as valuable and collectible assets – and knowingly permitted the Company's financial statements to fail to reflect the write-down or write-off of these receivables – when they were uncollectible in whole or in substantial part*.

**GAAP Violations Relating to the Impairment of Assets**

127.    Nortel's third quarter 2000 reported financial results were also materially overstated because they failed to recognize billions of dollars in impairment losses relating to goodwill that had been recorded in conjunction with certain of the Company's recent acquisitions of other companies at inflated prices.  The overwhelming majority of assets acquired through these acquisitions were identified as long-term in nature, predominantly "goodwill."

128.    GAAP requires that the reported value of long-term assets be assessed for impairment periodically, and, in particular, whenever certain triggering events occur, including: (i) a significant decrease in the market value of the asset; (ii) a significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator; and/or (iii) a current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.  SFAS No. 121, ¶¶4-5.

129.    SFAS No. 121 further requires that upon the occurrence of any of the triggering events set forth in the foregoing paragraph, the asset must be reported at the lower of carrying

amount or "fair value less cost to sell" and an "impairment loss" must be recognized to reflect any reduction of earnings.

130.    Nortel's third quarter 2000 Form 10-Q reported $12.45 billion in goodwill as part of the Company's reported assets.  This figure, and thus the Company's total reported assets, was substantially inflated because defendants failed to recognize impairment losses on a timely basis in conformity with GAAP, notwithstanding the existence of triggering events as discussed above.

131.    It was not until August 2001, in the Company's Form 10-Q for the period ending June 30, 2001, that Nortel finally announced that it would be taking a $12.4 billion write-down of intangible assets related primarily to the goodwill associated with the Company's acquisitions of Alteon Websystems, Inc., Xros, Inc., Qtera Corporation, and 980 NPLC Business:

> Nortel Networks recorded a $12,422 [million] write down of intangible assets in the three months ended June 30, 2001, based on the amount by which the carrying amount of these assets exceeded the fair value.  The write down is primarily related to the goodwill associated with the acquisitions of Alteon, Xros, and Qtera within Network Infrastructure and the acquisition of the 980 NPLC Business within Photonics Components.

132.    The charges set forth above were not taken on a timely basis.  By the third quarter of 2000, at the latest, Nortel's top executives and directors knew or recklessly disregarded that events had occurred which called for the write-down of billions of dollars in goodwill, including, among other things: (i) significant negative market changes in the Internet and telecommunications sectors, which had a materially negative impact on the demand for the technology and products acquired through Nortel's acquisitions; and (ii) problems with the development of the technology acquired through Nortel's acquisitions of, *inter alia*, Qtera and Xros, which materially delayed the completion of these projects and their ability to contribute to Nortel's consolidated revenues.

**On November 1, 2000, Nortel's Top Executives and Directors Issued
a Follow-Up Press Release Reaffirming Their Aggressive Forecasts
for Year-End 2000 and 2001**

133.    On November 1, 2000, just days after the Company's third quarter 2000 report,

Nortel's top executives and directors issued a press release on *PR Newswire* confirming and

reiterating their previously forecasted results for 2000.  The press release quoted Roth as follows:

> "We continue to expect that our percentage growth in revenue and earnings
> per share from operations in 2000 over 1999 will be in the low 40's," said John Roth,
> president and chief executive officer, Nortel Networks.  "In response to specific
> requests for guidance on the fourth quarter of 2000, we expect our revenue and
> earnings per share from operations in the fourth quarter of 2000 will be in the range
> of US$8.5 billion to US$8.8 billion and US$0.26 per share on a fully diluted basis,
> respectively.  Overall, we expect continued strong growth in Optical Internet,
> Wireless Internet, Local Internet and eBusiness solutions.  We continue to expect our
> optical Internet revenues to grow in excess of 125 percent in 2000 over 1999, to
> exceed US$10 billion."

134.    In the November 1, 2000 press release, Nortel's top executives and directors also

confirmed their previously made forecasts for 2001:

> "Looking forward to 2001, we continue to expect the overall market to grow
> in excess of 20 percent.  Given our strong market position and leadership in high
> performance Internet solutions, we continue to expect to grow significantly faster
> than the market, with anticipated growth in revenues and earnings per share from
> operations in the 30 to 35 percent range," said Roth.  "For the first quarter of 2001,
> consistent with historical profile trends, we expect our revenue and earnings per
> share from operations will be in the range of US$8.1 billion to US$8.3 billion and
> US$0.16 per share on a fully diluted basis, respectively."

135.    A spokeswoman for Nortel attributed the unusual timing of the announcement (the

week after reporting earnings for the third quarter) to the fact that the Company felt shareholders

needed to have this information laid out in light of the stock price volatility of the prior week:

> ***"We wanted to reassure our investors about our strong outlook*** ....
> Basically the reason we're doing this is because the market is unsettled, and there's
> confusion in the marketplace, so we thought it was important to give further clarity."

136.    Nortel's top executives' and directors' statements in the November 1, 2000 press

release were false and misleading because they misrepresented and/or omitted the following adverse

facts which then existed and the disclosure of which was necessary to make the statements made not materially misleading:

> (a)     The Internet and telecommunications markets contracted significantly during the third quarter of 2000, causing Nortel to experience a substantial decline in the demand for its products;

> (b)     They knew Nortel had suffered a steady deterioration of sales and revenues in its Enterprise Solutions Group, which historically has accounted for a significant portion of the Company's business;

> (c)     They knew or recklessly disregarded that, because of a continuing contracting market for Internet and telecommunications products, Nortel's customers would continue to reduce their orders for Nortel products throughout the fourth quarter of 2000 and into 2001;

> (d)     They had been informed by major customers prior to the close of the 2000 third quarter that their orders in the fourth quarter and throughout 2001 would be significantly reduced;

> (e)     They knew the Company had not experienced "continued strong growth" because Nortel's reported "growth" for the third quarter 2000 was materially inflated as a result of the accounting improprieties alleged above;

> (f)     They knew the Company failed to disclose that such fourth quarter 2000 results (revenues of $8.5 to $8.8 billion and EPS of $0.26) could be met only if defendants were to engage in the GAAP violations discussed below, which included the "pulling forward" of significant revenues from 2001 and future years;

(g)     They knew given the change in market conditions and representations from major customers that orders in 2001 would be substantially reduced, defendants did not actually expect the overall market to grow "in excess of 20 percent" in 2001; and

(h)     They knew that Nortel's guidance for 2001 (30%-35% revenue growth) would be nearly impossible to achieve in fight of the contracting Internet and telecommunications sectors and the fact that defendants planned to improperly sacrifice a substantial portion of Nortel's 2001 revenues by pulling those revenues into 2000.

**At Nortel's November 21, 2000 Annual Investor Conference,
Roth, Dunn and Chandran Continued to Falsely Forecast 30%-35%
Growth in 2001 and Falsely Described the Demand for Nortel's
Fiber-Optic Products as "Inevitable and Unstoppable"**

137.   On November 21, 2000, in Boston, Nortel held its annual conference for its shareholders and investors, at which Roth and Dunn quelled rumors about lost customers and inventory build-ups and re-affirmed that the Company would meet its aggressive growth targets for 2000 and 2001.  As reported in a *Bloomberg* news release after the three hour conference before a crowd of hundreds:

> Nortel Networks Corp. defended its 2001 profit and sales forecasts, encouraging investors who feared the biggest maker of fiber-optic equipment was being too optimistic about demand for its products.
>
> "***They gave us reassuring appraisal that the state of the market from their perspective is very healthy,***" John Simpson, a portfolio manager at Oeschle International Advisors LLC, said in an interview at Nortel's investor conference in Boston.  "The investment community was pretty skeptical."
>
> *                *                *
>
> Responding to investors who challenged his forecasts, Chief Executive John Roth reiterated that Nortel expects its ***sales and profit from operations, excluding costs for acquisitions, to rise 30 percent to 35 percent next year***, faster than industry average wide growth of more than 20 percent.

- 70 -

"*The engines that are underpinning Nortel are in good shape and moving along at a good clip,*" he told a packed room of investors and financial analysts. "*We're very bullish*."

138.    In addition, at the investor conference Dunn, Nortel's CFO, reiterating the Company's earlier forecast, told investors that revenues for the first quarter of 2001 would be between $8.1 billion and $8.3 billion.  Chandran, Nortel's COO, described the demand for fiber-optics as "*inevitable and unstoppable*," forecasting 40% growth in the optical networking market.

139.    These statements at the November 21, 2000 investor conference were false and misleading because they misrepresented and/or omitted the following adverse facts which then existed and the disclosure of which was necessary to make the statements made not misleading:

(a)    The state of the market was not "very healthy" because the Company was indeed experiencing a substantial slowdown in the demand for its products, including fiber-optics;

(b)    Nortel's insiders were masking these negative market changes through a host of GAAP violations, as discussed above;

(c)    Nortel's insiders knew the demand for fiber-optics was not "inevitable and unstoppable" as defendant Chandran represented, but rather had begun to wane substantially in the prior quarter;

(d)    Nortel's insiders knew that, in light of significant market changes, Nortel's customers would continue to reduce their orders for Nortel products throughout the fourth quarter of 2000 and into 2001;

(e)    Nortel's insiders had been informed by major customers prior to the close of the third quarter that their orders in the fourth quarter 2000 and throughout 2001 would be significantly reduced; and

(f)    Nortel's insiders knew the forecast for 2001 (30%-35% growth) would be impossible to achieve in light of the market changes and the fact that defendants planned to

improperly sacrifice a substantial portion of Nortel's 2001 revenues by pulling those revenues into 2000.

**In Interviews with CNBC and CNN on November 30, 2000, Roth
Falsely Denies Vendor Financing Concerns and a Slowing of New Orders**

140.    In a November 30, 2000 interview with CNBC's Maria Bartiromo and David Faber, Roth falsely reassured Nortel's shareholders and investors with regard to the credit risk associated with Nortel's escalating vendor financing activities:

> **David Faber**: Mr. Roth, another concern in your arena for big players like your own is vendor financing. How active are you in getting vendor financing?  Are you concerned at all about having extend[ed] credit to some emerging telecom players that may not be able to pay you back with buying [your] equipment?
>
> **John Roth**: No. *We have got some really blue chip people we finance....  We are not concerned at all*.

141.    In that same interview, Roth falsely represented the Company's growth prospects, stating: "We are going to grow 40 percent this year and because we are gaining share with tremendous velocity, we could see about 30 or 35 percent growth next year as well."  When asked by Bartiromo "[w]hen ... the slowdown in telecom spending will lessen," Roth denied that any such slowdown existed:

> **Roth**:  The slowdown, as you call it, really isn't quite that way.  This year what we saw was a lot of money being spent in the first half, not the second half.  But the telephone companies spend their money over a year period and I think the market got misled by the fact that most of the money was being spent in the first half of the year.

142.    Similarly, in an interview with CNN Financial Network's Muriel Siebert also on November 30, 2000, Roth continued to falsely assure investors about the Company's sales prospects:

> **Siebert**:  Do you see slow-up in new orders, or indications of orders?
>
> **Roth**:  No. *Our book-to-bill continues to be positive*.  The construction plans of moving ahead towards IP networks is where money is going.  And we are the company that has that portfolio.  A lot of our competitors don't have that position. As so we're continuing to take share at an increasing rate.

143.     Roth's statements in the November 30, 2000, interviews with CNBC and CNN Financial Network were false and misleading when made because they misrepresented and/or omitted the following adverse facts which then existed and the disclosure of which was necessary to make the statements made not misleading:

(a)      Nortel's top executives and directors knew that Nortel had, in fact, extended hundreds of millions of dollars in vendor financing to customers defendants knew or recklessly disregarded were uncreditworthy;

(b)      Nortel's top executives and directors knew that the Company was indeed experiencing a substantial decrease in new orders;

(c)      Nortel's top executives and directors knew that Nortel's book-to-bill ratio was being manipulated by the accounting improprieties described at ¶¶103-117 above;

(d)      Nortel's top executives and directors knew or recklessly disregarded that, in light of significant market changes, Nortel's customers would continue to reduce their orders for Nortel products throughout the fourth quarter of 2000 and into 2001;

(e)      Nortel's top executives and directors had been informed by major customers prior to the close of the 2000 third quarter that their orders in the fourth quarter and throughout 2001 would be significantly reduced;

(f)      Nortel's top executives and directors failed to disclose that 40% growth in 2000 could be achieved only if defendants were to engage in the GAAP violations discussed above; and

(g)      Nortel's top executives and directors knew that "30 to 35 percent growth" in 2001 would be impossible to achieve in light of the market changes and the fact that defendants

planned to improperly sacrifice a substantial portion of Nortel's 2001 revenues by puffing those revenues into 2000.

**In a December 14, 2000 Press Release, Nortel's Top Executives and Directors Falsely State that Revenue Growth Is Still Expected to Be at 40% for 2000 and 30%-35% for 2001**

144.     On the morning of December 14, 2000, Nortel's top executives and directors issued another press release on *PR Newswire* that was virtually identical to the November 1, 2000 statement, again confirming their previously stated guidance for 2000 and 2001. Specifically, quoting Roth, the release stated that "'percentage growth in revenue and earnings per share from operations in 2000 over 1999 will be in the low 40's.'" Roth was also quoted as saying that: "'As we enter the last two weeks of the quarter and the year, we remain *very confident in our previously stated guidance*.'" In addition, the press release forecast expected fourth quarter 2000 revenues of $8.5 to $8.8 billion and continued strong growth in Optical Internet, Wireless Internet, Local Internet and eBusiness solutions.

145.     With respect to the Company's prospects for 2001, the December 14, 2000 release stated:

> "Looking forward to 2001, we continue to expect the overall market to grow in excess of 20 percent. Given our strong market position and leadership in high performance Internet solutions, we continue to expect to grow significantly faster than the market, with anticipated growth in revenues and earnings per share from operations in the 30 to 35 percent range," said Roth. "For the first quarter of 2001, consistent with historical profile trends, we expect our revenue and earnings per share from operations will be in the range of US$8.1 billion to U.S.$8.3 billion and US$0.16 per share on a fully diluted basis, respectively."

146.     The statements in the December 14, 2000 press release were false and misleading because they misrepresented and/or omitted the following adverse facts which then existed and the disclosure of which was necessary to make the statements made not materially misleading:

(a)     Nortel's top executives and directors knew that Nortel had experienced a material decline in the demand for the Company's products throughout the fourth quarter, not "continued strong growth" as represented;

(b)     Nortel's top executives and directors knew that Nortel was slashing prices to below-cost levels and resorting to other desperate year-end measures in an effort to move product;

(c)     Nortel's top executives and directors knew that, in light of significant market changes, Nortel's customers would continue to reduce their orders for Nortel products throughout 2001;

(d)     Nortel's top executives and directors had been informed by major customers prior to the close of the third quarter and throughout the fourth quarter that their orders in 2001 would be significantly reduced;

(e)     Nortel's top executives and directors failed to disclose that such fourth quarter 2000 results ($8.5 to $8.8 billion in revenues) could be met only if they engaged in the GAAP violations discussed above; and

(f)     Nortel's top executives and directors knew that Nortel's forecast for 2001 (revenue growth "in the 30 to 35 percent range") would be nearly impossible to achieve in light of the market changes and the fact that they planned to improperly sacrifice a substantial portion of Nortel's 2001 revenues by pulling those revenues into 2000.

147.     By mid-December 2000, Nortel's top executives and directors were engaged in a desperate year-end scramble to boost reported revenues in a market in which orders were continuing to decline.  Every budget submitted by Nortel's optical systems customers during the last three months of 2000 was "at least 20% less" than the annual budgets submitted the prior year, including those budgets submitted by AT&T and WorldCom.  Prior to 2001, AT&T and WorldCom's

combined optical purchases alone totaled between $8 billion and $10 billion.  It was common knowledge at Nortel upon receipt of those budgets that 2001 sales were headed for a "serious decline."

148.    Shortly prior to the December 14, 2000 announcement, negotiations were being finalized on a deal with Verizon which were intended to, and would result in, a massive pull forward of revenues into the fourth quarter of 2000.  The year 2000 total sales target for the Verizon Network Services account was $600 million.  However, John Neville, Vice President of Team Verizon, revised that target upward to $1.1 billion in late September 2000, just three months before year-end, and instructed Nortel personnel to pull forward revenues from future quarters to meet that goal.  Those efforts took place from October through December 2000.  The $1.1 billion goal was met by piecing together an $800 million year-end contract.  However, of the $800 million in revenues, approximately $200 million were pulled forward from 2001 and approximately $300 million were pulled in from as far out as 2002 and 2003.

149.    On or about December 14, 2000, Nortel senior executives on the Verizon account met in New York to discuss and set revenue goals for 2001.  Present at that meeting were, among others, John Neville, Jim Collier, Jeffrey Haidinger, Scott Gibbs, all from sales, and Brian Trnkus, from Nortel's finance department.  Despite the fact that the 2000 sales target for the Verizon Network Services account at that time was $600 million and the Company was about to report over $1 billion in 2000 sales for that account, John Neville set the 2001 sales goal at just $300 million, a drop of more than 70% from $1.1 billion.  After Neville's suggestion of $300 million for 2001, a "shouting match" ensued because Nortel sales personnel knew that they would be unable to meet even a $300 million goal in 2001, given the negative market conditions and the massive pull forward of revenue that had been orchestrated in order to meet the Company's overly aggressive fourth quarter and year-

end 2000 earnings guidance. Moreover, it was suggested at that meeting that $100 million, less than

10% of the $1.1 billion in reported sales for 2000, would have been a more realistic target for 2001.

150.    In addition, sales of Nortel's broadband products had decreased throughout the fourth

quarter and had ground to a standstill by mid-December.  By the end of the 2000 fourth quarter,

Nortel's broadband customers stopped placing new orders completely and when those customers

were contacted by Nortel salespersons, the customers invariably stated that their warehouses were

full of Nortel's broadband products that they were unable to use and/or resell.  At the end of 2000,

large carriers, including Pacific Bell, "lost interest" in pursuing the development of a DSL customer

base, turning their focus instead to cable modem products.  Nortel's top executives and directors

knew that the substantial decrease in orders for broadband products in the fourth quarter would have

a materially negative impact on year 2001 sales because broadband customers typically ordered

months in advance in order to take advantage of various discounts.

151.    In November and December 2000, Nortel's top executives and directors were forced

to dump substantial quantities of optical hardware and other products at unprecedented discounts in a

desperate year-end measure to report revenues.  For example, on the Verizon account, in order to

move optical hardware (mostly Nortel's popular OC-12 and OC-48), prices were dropped 50% just

to move inventory and record $45 million in sales to Verizon alone. Former Nortel employees

referred to the unprecedented year-end event as a desperate "fire sale," explaining that a typical year-

end reduction on the equipment, if any, would be 10%, not 50%.  It was discussed and understood at

Nortel that the price reductions would necessarily have a devastating impact on 2001 revenues

because the Company would be unable to raise the prices on those products back to normal levels.

Similarly, in the fourth quarter of 2000, Nortel sold products to FairPoint at reductions so steep that

Nortel lost money on the deal. "Fire sales" occurred with other substantial Nortel customers, including Sprint and WorldCom.

152.    Throughout December 2000, order managers were directed to ask customers to accelerate payments to Nortel on partially completed projects, even though payments were not yet due, and were forced to attend frequent, and sometimes daily, meetings to report on the progress of the year-end "scramble for revenue."

**On January 18, 2001, Nortel's Top Executives and Directors Caused Nortel to Report "Strong" Fourth Quarter and Year-End 2000 Financial Results, Emphasize "Continuing Strong Market Demand" and Reaffirm Aggressive Forecasts for 2001**

153.    On January 18, 2001, Nortel's top executives and directors issued a press release over the *Business Wire* in which they falsely reported record results for the year 2000, crowned by purportedly strong results for the fourth quarter. With respect to the fourth quarter, Nortel's top executives and directors reported that "[r]evenues increased 34 percent to US$8.82 billion" and that "[n]et earnings from operations ... were US$825 million, or US$0.26 per share on a diluted basis, compared to US$607 million, or US$0.21 per share on a diluted basis, for the same period in 1999, an increase in earnings per share from operations of 24 percent." In addition, Roth was quoted as saying: "*We are extremely pleased with our fourth quarter results, especially the strong growth in Optical Internet, Wireless Internet, and Core IP Networking*.'"

154.    With respect to the full-year 2000, Nortel's top executives and directors reported that revenues increased 42% to $30.28 billion, and that net earnings from operations were $2.31 billion, or $0.74 per share on a diluted basis, compared to $1.43 billion, or $0.52 per share on a diluted basis, for 1999, an increase in earnings per share from operations of 42%. Roth was quoted: "*Overall, the fourth quarter capped a year of exceptional growth, which was in line with our expectations*.'"

155.    After reviewing Nortel's purportedly exceptional performance for 2000, the press release quoted Roth and Dunn as they forecasted the Company's prospects for 2001.  Despite the very negative conditions existing at the time, Roth stated:  "'We see continuing strong market demand in our target industry segments.'"  Dunn added:

> "[W]e are projecting growth in revenues and earnings per share from operations in 2001 over 2000 of 30 percent.  For the first quarter of 2001, we expect revenues of US$8.1 billion and earnings per share from operations of US$0.16 on a diluted basis. Our views for the quarter and the year are within the ranges we previously communicated."

156.    As reported in the *Knight Ridder Tribune Business News* on January 19, 2001, in response to questions about how a slowing U.S. economy would affect Nortel, Roth said: "There is a bear market out there ....  People are talking about more bad news than is appropriate.  Our business is really well centered in areas of high growth."  Roth continued:  "Any kind of slowdown is going to hurt our competition more than it will hurt us."

157.    The statements made on January 18 and 19, 2001, were false and misleading because they misrepresented and/or omitted the following adverse facts which then existed and the disclosure of which was necessary to make the statements made not materially misleading:

(a)    Nortel's top executives and directors knew that representations that Nortel experienced "strong growth" in the fourth quarter and "exceptional growth" in full-year 2000, were materially false and misleading because the Company had, in fact, experienced a significant decline in the demand for its products as a result of negative market changes in the third and fourth quarters. The reported "growth" was predicated upon third and fourth quarter 2000 revenues that were materially inflated by the numerous GAAP violations detailed herein;

(b)    Nortel's top executives and directors knew that the financial results reported for the fourth quarter and full year-end 2000 were materially misstated and presented in violation of GAAP;

- 79 -

(c)     Nortel's top executives and directors knew that it was only as a result of these GAAP violations that Nortel was able to report financial results for the fourth quarter and year-end 2000 consistent with defendants' previously stated guidance;

(d)     Nortel's top executives and directors knew that knew that "30 percent" growth in revenues and earnings per share in 2001 would not be possible because, as alleged above, throughout the fourth quarter of 2000, they received budgets from numerous customers indicating that their 2001 orders would be substantially below that of 2000.   Indeed, Verizon's optical purchases were projected to be less than 10% of the $1.1 billion reported in 2000, and AT&T, WorldCom and other major customers submitted budgets for 2001 that were 20% lower than those of 2000.   In addition, they knew or recklessly disregarded that 30% growth in 2001 would not be achievable in light of the fact that, as alleged above, they had already booked billions of dollars in 2001 revenues by pulling them into the third and fourth quarters of 2000; and

(e)     Nortel's top executives and directors knew that Roth's statements as quoted in the *Dallas Morning News* on January 19, 2001, suggesting that Nortel was somehow insulated from a slowdown in the telecommunications industry, were false because Nortel had, in fact, been feeling the impact of a material slowdown for the previous two quarters, but had masked the impact of those negative market changes on Nortel's business by improperly inflating reported revenues and asset values, as discussed herein.

**Nortel's Top Executives and Directors Caused Nortel's Fourth Quarter and Year-End 2000 Reported Financial Results to Be Materially Misstated in Violation of GAAP and SEC Reporting Rules**

158.     As in the 2000 third quarter, in order to conceal the impact of the significant contraction of the Internet and telecommunications markets on Nortel's business, Nortel's top executives and directors engaged in a number of accounting improprieties which caused the

Company's financial results for the fourth quarter and year-end 2000 (as reported on January 18 and 19, 2001), to be falsified, inflated and misstated in violation of GAAP and SEC reporting rules. For example:

(a)     Defendants improperly recorded and reported revenues on shipments of products in instances where Nortel had extended credit on 100% of the sales price of the products to the vendor-financed customer whom defendants knew to be uncreditworthy and unable to pay for the products, in violation of the Company's internal revenue recognition policies as well as in violation of FASB Concepts No. 5, ¶¶83-84, APB Opinion No. 10, ¶12, SAB No. 101, and SOP 97-2, ¶¶8, 27-30.

(b)     In connection with making certain vendor-financed loans, defendants also improperly required customers to purchase significant quantities of additional product the customer neither needed nor wanted, thereby materially inflating current period orders and increasing the risk of material returns.  This practice violated several fundamental accounting principles, including FASB Concepts No. 1, ¶¶34, 42, 58-59.

(c)     Defendants improperly failed to take a charge against earnings in the fourth quarter of 2000 to account for the fact that the value of goods re-acquired from vendor-financed customers upon their default had diminished substantially below cost because such products were used, the prices had changed, and/or the products had been rendered obsolete by newer technology. ARB 43, Chapt. 4, Statement 5.

(d)     Defendants improperly pulled forward hundreds of millions, if not billions, of dollars in revenues from 2001 and beyond into the fourth quarter of 2000, in violation of FASB Concepts No. 1 and SOP 97-2.  Indeed, as alleged in detail above, at least $500 million was pulled forward on the Verizon account alone.

(e)    Defendants improperly recognized revenues on the basis of "letters of intent" to purchase product, in lieu of formal purchase orders, in violation of FASB Concepts No. 5, SAB No. 101, and FASB Concepts No. 1, ¶42.

(f)    Defendants improperly booked revenues on the shipment of substitute products when certain products were in short supply during the fourth quarter, in violation of FASB Concepts No. 5, ¶84.

(g)    Defendants improperly recognized revenues on the sales of products to new customers prior to the expiration of the date by which those customers were permitted to return the product, in violation of SFAS No. 48, and SOP No. 97-2, ¶31.

(h)    Defendants failed to recognize the uncollectibility of a substantial portion of the Company's receivables, through reserves or charges against income, in violation of FASB Statement No. 5, ¶3, SFAS No. 5, ¶¶1, 8, APB Opinion No. 28, ¶17, and Regulation S-X (17 C.F.R. §210.10-01).

(i)    Defendants failed to recognize billions of dollars in impairment losses relating to goodwill that had been recorded in conjunction with certain of the Company's recent acquisitions, in violation of SFAS No. 121.

159.    It was only as a result of these accounting improprieties that Nortel's top executives and directors were able to seemingly meet Nortel's projected results for the fourth quarter and year-end 2000.  Had Nortel's top executives and directors not committed the numerous GAAP violations detailed above, however, Nortel's fourth quarter and year-end 2000 reported financial results would have fallen far short of Nortel's previous forecasts.

# THE TRUTH BEGINS TO EMERGE ABOUT 1999-2000

160.    On February 15, 2001, Nortel's insiders publicly lowered Nortel's forecasts for 2001. They admitted that the Company was seeing a "faster and more severe economic downturn in the United States" and "longer than expected delays in spending by ... U.S. customers as they continue to assess the impact of the economic and market conditions on their businesses."  They further stated: "We now expect the U.S. market slowdown to continue well into the fourth quarter of 2001." They also indicated the Company would be laying off thousands of employees.

161.    The market was shocked by this announcement and reaction was swift and punitive. Nortel's stock price plunged from $29.75 to trade as low as $19 on February 16, 2001, on enormous trading volume.

162.    On April 19, 2001, Nortel reported disappointing first quarter 2001 revenues of just $6.18 billion, compared to $6.32 billion for the same period in 2000.  Nortel's insiders admitted that the significantly lower-than-expected revenues were due to "reduced capital spending by service providers and enterprises resulting from tighter capital markets and a severe slowdown in the U.S. economy."  They also revealed that the Company would be doubling the job cuts to 20,000 and that they would not be giving any further financial guidance.  All of these trends and factors had been in place when Nortel's top executives and directors made their false projections during 2000 and early 2001.  Nortel's stock price never recovered, falling to as low as $.47 in the Fall of 2002.

163.    Despite the fact that, throughout 2000 and during early 2001, Nortel's top executives and directors had caused Nortel to forecast 30%-40% growth in 2001, the collapse of the Internet and telecommunications sectors in 2000 and the fact that they had cannibalized much of Nortel's anticipated 2001 revenues in order to artificially boost Nortel's reported financial results for the third

and fourth quarters of 2000, resulted in Nortel's reported revenues in 2002 being substantially below what was reported for the same period in 2000:

| | Revenues (Quarterly Period Ending March 31) | Revenues (Quarterly Period Ending June 30) | Revenues (Quarterly Period Ending Sept. 30) | Revenues (Quarterly Period Ending Dec. 31) |
|---|---|---|---|---|
| 2000 Revenues | $6.32 billion | $7.207 billion | $6.726 billion | $8.198 billion[2] |
| 2001 Revenues | $6.18 billion | $4.61 billion | $3.694 billion | $3.456 billion |
| % Change | -2% | -41% | -45% | -58% |

164.    As 2001 unfolded, Nortel was forced to take billions of dollars of writedowns on the acquisitions for which it had previously so overpaid, which, combined with other losses, writedowns and charges, resulted in Nortel suffering astonishing losses of over $30 billion during 2001-2002, wiping out all of its claimed operating profits for the past several years – operating profits upon which Nortel executives' year 2000 multi-million-dollar bonuses had been based.  These gigantic writedowns and losses also virtually wiped out all of Nortel's shareholder equity, decimating its shareholder community which watched as Nortel's stock suffered a sickening decline to as low as $.47 per share in the Fall of 2002 – one of the worst stock price collapses in history.

165.    As a result of these events, in 2001, Nortel was sued for violation of the U.S. federal securities laws on behalf of all investors in securities of Nortel stock in *Nortel I* to recover damages caused by defendants' violations of the anti-fraud provisions of the federal securities laws.  Nortel was also sued for alleged violations of the ERISA during 2000-2001 in a class action suit.  Nortel is

_____

[2]       This amount is lower than the revenue Nortel originally reported for the fourth quarter 2000, due to the exclusion of discontinued operations.

being forced to spend millions of dollars to defend these suits. The complaints in these class actions have been upheld by the court, resulting in Nortel facing billions of dollars of liability.

166.    While Nortel's then CEO (Roth) and COO (Chandran) were put out of the Company as sacrificial lambs during 2001, Nortel's directors orchestrated their departures to assure that no independent or honest outsider would obtain a top executive position at Nortel and thus be in a position to expose the manipulative and illegal conduct, and their involvement therein, that had gone on at Nortel. When Roth was replaced as CEO in late 2001, Nortel's directors replaced him with Frank Dunn, who had been the Chief Financial Officer of Nortel during 1999-2000 and thus was fully aware of – and an active participant in – the financial manipulations and overstatements of 2000, which had yielded him a bonus of over one million dollars in 2000 alone, so that his silence and cooperation could be counted on. And to fill Dunn's critical position as CFO, the Nortel directors chose to elevate defendant Beatty, who had been Nortel's corporate controller during 1999-2000, and, like Dunn, was fully aware of and an active participant in the 2000 financial manipulations and falsifications at Nortel, which had yielded him a bonus in 2000 as well. In fact, Dunn was named as a defendant in the *Nortel I* class action suit and Nortel's directors knew, based on their own participation in the events covered by *Nortel I* and the investigation and evaluation made by them of that complaint that the allegations against Dunn in *Nortel I* were accurate. And to fill Beatty's position as corporate controller, Nortel's directors picked defendant Gollogly, who was assistant controller during 1999-2001 at Nortel and was thus also aware of and involved in the financial overstatements of 2000.

## EVENTS OF 2002-2004

167.    In 2001 and early 2002, as Nortel's new executive management team (led by Dunn and Beatty) took over, they knew that Nortel would shortly install new bonus compensation

programs for the executive and management employees at Nortel, which would be based on Nortel's ultimate return to profitability.  To position themselves to be certain they could cash in on such programs, during 2001-2002, as Nortel was reporting large losses – $27.3 billion in 2001 and $3.5 billion in 2002 – they caused Nortel to take hundreds of millions of dollars of *excessive loss reserves (accruals)* for various items, including doubtful accounts receivable, excessive goodwill write-offs and restructuring costs, knowing that since Nortel was going to be reporting extremely large losses anyway during 2001-2002, increasing those losses with even a billion dollars of excessive reserves would have no material impact on Nortel's already impaired financial condition and greatly depressed stock price.  However, by creating these hundreds of millions of dollars of "cookie jar" reserves, *i.e.*, reserves that were much larger than justified or called for by Nortel's actual financial and business conditions at the time they were taken, Dunn and Beatty and Nortel's other executives had created for themselves a huge secret reservoir which they could later draw down upon, if necessary, to create or boost future reported profits to make it appear that Nortel had returned to profitability or achieved other financial targets, triggering their entitlement to millions of dollars of bonuses.

168.   In fact, during 2002, Nortel's top executives and directors crafted and put into place (*without shareholder approval*) new bonus compensation plans for Nortel's top executives and managers.  One plan was known as the "Return to Profitability Program," under which Nortel's executives and managers were to receive large bonuses if Nortel returned to operating (pro forma) profitability for even one quarter and even larger incremental bonuses if that profitability could be sustained for four quarters, *provided that the return to profitability took place prior to the beginning of 2004*!  Another new plan – for the very top executives – also provided for even larger bonuses if Nortel achieved sales growth and profitability during 2003.

169.   Nortel's Board knew or recklessly disregarded that these highly unusual bonus compensation plans created strong, indeed perverse, incentives and the opportunity for Nortel's top executives to manipulate and falsify Nortel's financial results during 2003 to create profits to trigger huge bonus payments to themselves, including by drawing down on previously established excessive reserves.  Yet the Board took no action to safeguard against such abuse or to even determine if Nortel's existing internal accounting and financial controls were sufficient to prevent such abuse.

170.   After the 2001-2002 disastrous collapse of Nortel and the severe criticism that collapse brought on Nortel's Board, the Board was anxious to restore Nortel's credibility with Nortel's shareholders and the investment community and to assure them that Nortel was a company with integrity, that was honest and that obeyed the law.

171.   In early 2003, Nortel's top executives and directors issued Nortel's 2002 Annual Report to Shareholders.  It contained a "Message From the Chairman," signed by defendant Wilson, which stated:

**Looking Forward**

*       *       *

We move ahead in a business environment still coming to terms with corporate scandals that highlighted the need for high standards of ethical business behavior.  One result has been intense public scrutiny of corporate governance issues and of the role of boards of directors.  New rules and regulations are being implemented in many countries.

**A Company of Best Practices**

Many of the proposed new rules and regulations focus on director independence and expertise, together with board processes and responsibilities....

***Nortel Networks has always strived to be a "best practices" company.  We have a tradition of maintaining a strong system of governance within which the board and management can address their respective responsibilities***.  This is a structure designed to enhance goal setting, decision-making, and appropriate monitoring of compliance and performance within a framework of solid corporate values.

We believe we have a well-balanced board of directors who bring to the corporation a wealth of experience and a broad range of knowledge and skills. ***Our directors are people of objectivity, high values, business acumen, and sound judgment who provide wise counsel and harness their talents to pursue the objectives of the company. They act with integrity and discipline*** and demonstrate a commitment to the corporation, its business strategies, and long-term shareholder value as they perform their responsibilities supervising the management of the business affairs of he corporation.

                              *          *          *

We communicate with our shareholders in a variety of ways, including quarterly reports [and] the annual report .... ***At all times, we try to state things as candidly*** ... as possible to help investors understand the company's business and the environment in which we operate.

**Corporate Governance and Responsibility**

I'm confident that our board has a good record when it comes to corporate governance and corporate responsibility. But there's always room for improvement. We'll continue to review guidelines and practices as well as proposed governance reforms, not just to ensure compliance but also in order to implement what we believe are the most effective governance policies and practices for the company.

There is clearly a need for greater openness and transparency at a time when boards are being examined as never before for their independence, integrity, and effectiveness. Accordingly, we have reviewed and renewed our set of corporate governance practices. These, together with our board mandate, are posted on our website at www.nortelnetworks.com.

                              *          *          *

On behalf of the board, I can assure everyone with a stake in our future that the directors will continue exercising diligent oversight of the business affairs of the corporation, working with Frank Dunn and his team as they carry out their strategy to restore profitability and confidence in our company in the year ahead.

172.    The 2002 Annual Report also contained a letter signed by CEO and President Dunn,

which stated:

We've set several priorities for the year ahead. Our number one priority is continued improvement in our financial model. We're looking to manage for profitability ....

                              *          *          *

We'll do so guided by our corporate values ... guiding how we do business and behave as a company.... *[A]lways acting with integrity* ....

173.    Elsewhere, the Annual Report stated:

*Integrity ... underpins everything....*

*We are honest and obey all applicable laws....*

174.    On March 10, 2003, Dunn, as President and CEO, and Beatty, as Chief Financial Officer of Nortel, as required by the laws of the United States, signed and filed false certifications on behalf of themselves and Nortel with the SEC relating to Nortel's joint report on Form 10-K for 2002.  Their certification stated in part:

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the issuer and have:

(a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

     (a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

     (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.     The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

175.     As 2003 unfolded, Nortel's top executives and directors consistently told Nortel's shareholders that the turnaround had come, their stewardship was succeeding and Nortel was returning to profitability. On February 20, 2003, Dunn spoke to analysts and Nortel shareholders. He told them: "***This is not about breaking even, but starting to make money,*" and Nortel "*will make money in today's environment....  I've turned the page about getting back to break even ... I've now looked at how to make an increase in profitability for our stakeholders***."

176.     On April 24, 2003, Nortel announced its first quarter 2003 results – reporting a surprise return to profitability:

First Quarter 2003 Results

     Revenues were US$2.40 billion for the first quarter of 2003 compared to US$2.91 billion in the same period in 2002.  Nortel Networks reported net earnings in the first quarter of 2003 of US$54 million, or US$0.01 per common share, compared to a net loss of US$841 million, or US$0.26 per common share, in the first quarter of 2002.

*     *     *

     "I am extremely pleased to have achieved profitability in the first quarter of 2003 and reached our goal one quarter early," said Frank Dunn, president and chief executive officer, Nortel Networks.

177.     On April 25, 2003, *The Globe and Mail* reported:

Nortel Networks Corp. reported its first quarterly profit since 1999 yesterday ....

"*We have made a lot of progress at Nortel Networks*," chairman Lynton Wilson told the company's annual meeting in Ottawa. The assembled group of several hundred people applauded Frank Dunn, president and chief executive officer, when he detailed the first-quarter results.

"We've positioned ourselves to go on the offensive," Mr. Dunn told shareholders ....

178. On April 25, 2003, *The Toronto Star* reported:

*Nortel back in black, surprising analysts -- $54 million U.S. profit surpasses loss predictions* ....

Nortel Networks Corp. reported a surprise return to profit yesterday, a quarter ahead of its own forecast ....

\*          \*          \*

Nortel reported a first quarter profit of $54 million, or 1 cent per share, compared with a loss of $841 million, or 26 cents per share, in the corresponding period last year.

179. On July 24, 2003, Nortel Networks reported its second quarter 2003 results – breakeven on a GAAP basis, but profitable "pro forma" on an operating basis. In August 2003, Nortel's 10-Q for the quarter ended June 30, 2003 was filed with the SEC. The report signed by Beatty and Gollogly stated:

As at the end of the period covered by this report, Nortel Networks carried out an evaluation under the supervision and with the participation of management, including the President and Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Nortel Networks disclosure controls and procedures. *Based upon that evaluation, the President and Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in the reports Nortel Networks files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required* ....

180. On October 23, 2003, Nortel issued a release reporting strong third quarter profits:

**Nortel Networks Reports Preliminary Results for Third Quarter of 2003 and Provides Update on Comprehensive Review of Assets and Liabilities including Planned Restatement**

- Q3 2003 revenues of US$2.27billion

- 91 -

-    Q3 2003 net earnings of approximately US$179 million; approximately US$0.04 per common share on a diluted basis

The release also stated:

    The Company also announced that it intends to restate its financial results for 2000, 2001 and 2002 and the first and second quarters of 2003, as a result of its comprehensive asset and liability review and other related reviews (as more fully described below) which are still ongoing.  While the work is not complete, Nortel Networks currently expects that the principal impacts of the restatements will be:  a reduction in previously reported net losses for 2000, 2001 and 2002; and an increase in shareholders' equity and net assets previously reported on Nortel Networks balance sheet as at June 30, 2003.  None of the adjustments are expected to have any impact on cash balance as at June 30, 2003 nor does the Company expect the adjustments to impact its forward business operations.

                    *       *       *

    As part of its preliminary finding arising from the comprehensive review, Nortel Networks has determined that approximately US$900 million of liabilities (including accruals and provisions) carried on its previously reported balance sheet as at June 30, 2003 will be released into prior periods in the restatements.  The analysis undertaken to date has indicated that these provisions were either recorded incorrectly in prior periods or not properly released, or adjusted for changes in estimates, in the appropriate periods.

    181.    Nortel's top executives presented the restatement as '***no big deal***' – in fact, as a

positive which ***reduced*** previously reported losses and would not have any impact on Nortel going

forward.  On October 23, 2003, Nortel held a conference call for its shareholders and investors.

    **Frank Dunn**:  ... Today we announced preliminary quarter 3 results and a planned restatement for the financials for 2000 and 2002 period, as well as the first half of 2003.

                    *       *       *

    Let me first state that Nortel Networks strives for the highest level of integrity and transparency in both its business operations as well as financial reporting....

    ***Again, I would like to emphasize that this process has no impact on ... our operations going forward.***

                    *       *       *

- 92 -

[W]e expect, based on where we are on a year-to-date basis ... to return to profitability of the full year for 2003.  That will be the first time in six years that Nortel's returned to a full-year profitability.

So again, a lot of great progress....  [I]t's very ... important to remember the tremendous progress to be made and we continue to reposition Nortel to be successful going forward.

182.    Nortel executives went out of their way to minimize the importance or impact of the

proposed restatement.  On October 24, 2003, *The Toronto Star* reported:

**Nortel predicts annual profit; Third-quarter earnings total $179 million U.S. losses from previous years to be scaled back**

Nortel Networks Corp. is restating its financial results for the past 3 1/2 years -- largely upward -- and expects that 2003 will produce its first annual profit in six years.

Nortel said yesterday that the main impact of the restatement will be to reduce previously reported net losses ... by about $750 million.

The Brampton-based company ... also announced it earned $179 million, or 4 cents per share, in the third quarter.

\*       \*       \*

[Dunn] told analysts in a conference call that Nortel will end 2003 with its first annual net profit since 1997 ....

*"When I was entering this year, a lot of people didn't think Nortel would make a profit in a quarter," he said.  "We will make a profit not only in a quarter but a profit on the full year and that's the first time in six years*."

\*       \*       \*

Doug Beatty, Nortel's current financial officer, said he doesn't believe the company's credibility is at risk from the review of its financial position.

"It's a voluntary process," Beatty said, adding ....  "Integrity is important."

183.    On October 24, 2003, *The Globe and Mail* reported:

**Nortel posts profit, restates**

"When you say restatement, a lot of people go 'whoa,'" Frank Dunn, Nortel president and chief executive officer, said in an inteview yesterday.  "It was the right

thing to do.  It was something we have to put behind us.  ***The real focus is that Nortel will make money this year***."

*        *        *

Mr. Dunn spoke with a positive tone on the company's conference call.  He asked analysts not to be distracted by the restatement....

"I'm very pleased with our prospects," he said, adding that there's been "a lot of great progress" as he cited the predicted 2003 profit.

184.    On October 24, 2003, *The Financial Post* reported:

**Nortel Sees first profit in six years:  On back of strong third quarter, CEO Frank Dunn forecasts full year in black**

Frank Dunn, Nortel's president and chief executive, said the Brampton, Ont.-based company's healthy progress, specifically in the wireless sector, has put the business on a solid footing.

"From a going forward prospective, I am very pleased with our prospects," he said during a conference call with analysts....

Mr. Dunn said ... Nortel will make a profit for the full year.  "***This is the first time in six years Nortel will have returned to profitability***," he said.

185.    With respect to each of Nortel's first, second and third quarter 2003 results as filed

with the SEC, as required by the laws of the United States, Dunn and Beatty signed a certification as

required by Sarbanes-Oxley, which stated:

1.      I have reviewed this quarterly report on Form 10-Q for the [applicable] quarter of 2003 of Nortel Networks Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

- 94 -

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this reported based on such evaluation; and

(c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

In addition, Dunn and Beatty also certified:

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Nortel Networks Corporation, a Canadian corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended [applicable] (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

186.    On January 29, 2004, Nortel reported very strong fourth quarter 2003 results:

**Nortel Networks Reports Results for the Fourth Quarter and Year 2003**

Fourth Quarter 2003 Results

Revenues were US$2.83 billion for the fourth quarter of 2003 compared to US$2.53 billion for the fourth quarter of 2002 and US$2.27 billion for the third quarter of 2003. Nortel Networks reported net earnings in the fourth quarter of 2003 of US$499 million, or US$0.11 per common share on a diluted basis, compared to a net loss of US$168 million, or US$0.04 per common share, in the fourth quarter of 2002 and net earnings of US$185 million, or US$0.04 per common share on a diluted basis, in the third quarter of 2003.

\*       \*       \*

Commenting on Nortel Networks financial performance, Frank Dunn, president and chief executive officer, Nortel Networks, said, "***With the challenges that we faced in 2003, the Company had a tremendous year, truly marking a turning point for Nortel Networks***."

\*       \*       \*

Year 2003 Results

For the year 2003, revenues were US$9.81 billion compared to US$10.57 billion for the year 2002. Nortel Networks reported net earnings of US$732 million, or US$0.17 per common share on a diluted basis for the year 2003, compared to a net loss of US$3.27 billion, or US$0.85 per common share, for the year 2002.

187.    On January 29, 2004, Dunn and Beatty hosted a conference call with analysts and Nortel shareholders. During the call, Dunn and Beatty trumpeted the Company's fourth quarter results, and noted that 2003 represented the Company's ***first full-year profit in six years***. Dunn stated that "***Nortel has had a tremendous fourth quarter and an extremely strong full year***," and Beatty stated that "***we have made significant sequential progress in strengthening our financial position***," and that the Company had "***exceeded expectations***" with respect to reporting high profit margins in its last two quarters. Nortel's stunning fourth quarter 2003 results capped what appeared to be a fantastic corporate turnaround. Analysts and investors were swept off their feet by these remarkable developments.

- 96 -

188.    The impression these expectedly strong 2003 results had on analysts was very substantial: "*Really good numbers*," said Wojtek Uzdelewicz, a senior managing directors at Bear Stearns during the analyst's call.  "*Great execution.  The numbers look really good*."

189.    On January 30, 2004, *The Wall Street Journal* reported:

**Nortel's Profit of $499 Million Exceeds Forecast**

Nortel Networks Corp., buoyed by surging sales of wireless networking gear, reported a solid fourth-quarter profit after a year-earlier loss, and far surpassed analysts' expectations.

Nortel, the Brampton, Ontario, telecommunications-equipment supplier, posted net income of $499 million, or 11 cents a share, compared with a year-earlier loss of $168 million, or four cents a share....

... *[N]ortel's results were still better than expected*.

\*          \*          \*

Nortel Chief Executive Officer Frank Dunn said the latest results – including a full-year 2003 profit of $732 million, or 17 cents a share, its first annual profit in six years – mark a "*turning point for Nortel Networks*."

190.    On January 30, 2004, *The Toronto Star* reported:

**Nortel posts profit, its first since '97; Higher revenue surprises analysts 'It's a blowout quarter,' one says**

Nortel Networks Corp. earned $732 million (U.S.) in 2003, beating analysts' estimates ....

\*          \*          \*

"*It's a blowout quarter*," said Duncan Stewart, Tera Capital's technology portfolio manager ....

191.    On January 30, 2004, *The Globe and Mail* reported:

**Nortel surges on strong results; Poised to become Canada's No. 1 firm, as sales sharply surpass expectations**

Nortel Networks Corp. is poised to reclaim its title of Canada's most valuable company today after a stunning after-hours surge in its stock last night, *driven by strong fourth-quarter results that blew past analysts' estimates*.

- 97 -

"*We've had a great quarter*," Frank Dunn, Nortel president and chief executive officer, said in an interview.

\*      \*      \*

Share profit from continuing operations was 9 cents, well above analysts' consensus estimate of 2 cents.

"*They blew through the numbers*," said Tom Lauria, an independent analyst at Avtera Management LLC in New Jersey.

\*      \*      \*

"We expect to grow faster than the market for 2004," Mr. Dunn said on a conference call.

192.   On January 30, 2004, *The National Post* reported:

**Tech high on Nortel 'blow-out' profit year:  Better-than-expected performance signals that recovery may be here to stay**

"***This is a blow-out quarter***," said Duncan Stewart, a partner with investment firm Tera Capital.

"***It is far in excess of what anyone was looking for from Nortel.... Hats off to Frank Dunn***."

\*      \*      \*

"This is a great year," Mr. Dunn said.  'Nortel had a tremendous fourth quarter and an extremely strong full year."

193.   On January 31, 2004, *The Toronto Star* reported:

Nortel Networks Corp. regained the title of Canada's highest-valued company yesterday after surpassing Royal Bank's $41.6 billion market capitalization.

The Brampton-based telecommunications-equipment maker saw its shares soar 18 per cent to $10.38 on the Toronto Stock Exchange after reporting fourth-quarter profits and revenues Thursday ***that blew past analysts' expectations***.

194.   On January 31, 2004, *The Globe and Mail* reported:

- 98 -

**Nortel regains star status; stock soars 18.5%; Analysts revise outlooks after company reports stellar fourth-quarter results**

Nortel Networks Corp. stock jumped 18.5 percent yesterday as analysts showered the communications equipment company with praise a day after it reported better-than-expected quarterly results.

"*What do [you] do with the stock?" analyst Tom Astle of National Bank Financial Inc. asked in a report.  His answer was succinct:  "You buy it*."

Stock of the company his an intraday high of $11.94 yesterday two minutes after the market opened, up 36 per cent from Thursday's close....  *It reclaimed its position as Canada's most valuable company, a title it held from May, 1999, through August, 2001*.

After Nortel's strong fourth quarter, during which sales and profit easily exceeded expectations, *analysts were quick to revise their forecasts, increasing their financial estimates, as well as increasing their ratings on the stock and their one-year stock price projections*.

\*       \*       \*

"*We are gaining momentum*," said Frank Dunn, Nortel president and chief executive officer, in an interview Thursday.

195.    On February 2, 2004, *The Toronto Star* reported:

On Friday, Brampton-based Nortel recaptured its rightful spot as the largest company in Canada by market value, overtaking Royal Bank with a new market cap of $43 billion.

\*       \*       \*

Remember when some analysts were using the words "bankruptcy" and "Nortel" in the same breath?  That was only 15 months ago ....

\*       \*       \*

The encouraging news is that Nortel is making fewer promises and delivering more than expected.  This contrasts with the days of taking big, spending even bigger, and hiding the real story behind some very creative accounting that, admittedly, was par for the course four years ago.

196.    "'[W]e've got a business model that everybody feels great about,'" Dunn told the

*Financial Times* in February 2004, a few weeks before Nortel dropped its bombshell about needing

to restate its financials for the previous several years.  "*We climbed a hill that no one thought could be climbed*,'" said Dunn.

197.    On February 4, 2004, *The Globe and Mail* reported:

**Nortel brass get millions more in bonuses**

Sixteen executives at Nortel Networks Corp. have been granted about $30-million (U.S.) worth of cash and stock, the second payout in a four-part special bonus program that has already handed managers $13.6-million.

\*       \*       \*

The special bonus program, which exists above and beyond a larger "return to profitability" bonus plan, was established in January, 2003.  It set four targets for a three-year period, based on results measured by "return on sales before tax," which was not explained further.  Other factors are also considered, such as Nortel's performance compared with competitors.

The $13.6-million payout was made in July.  Nortel's board of directors authorized the second payment last week when the company reported better-than-expected quarterly results and its first full-year profit since 1997.

\*       \*       \*

Special bonuses, which will be paid half in cash and half in common shares, went to 16 executives but Nortel's two top leaders weren't included in this round.  Frank Dunn, Nortel's president and chief executive officer, received a special bonus of $2.15-million in July.  Doug Beatty, chief financial officer, received $831,000 in July.

198.    According to another published report:

Another result of the company's announced profit of $732 million was the activation of a special bonus scheme introduced in 2003.  The company already had a general "return to profitability" plan for most employees and the special plan linked bonuses to returns for senior executives.  The *Globe and Mail* of Toronto reported that $43.6 million in cash and stock has been paid to 16 executives under the special plan.  Mr. Dunn, according to the newspaper, was given $2.15 million and Mr. Beatty received $831,000.

199.    The stock bonuses awarded to Nortel's top executives for 2003 were: Beatty, CFO, $2,930,875; Bolouri, President Global Operations, $2,702,980; Collins, President Enterprise Networks, $2,717,907; Debon, President Wireless Networks, $3,784,749; DeRoma, Chief Legal

Officer, $2,702,980; William Donovan Sr., VP Human Resources, $2,184,486; Dunn, CEO, $7,553,050; John Giamatteo, President Asia Pacific, $1,524,061; Gollogly, Controller, $1,l33,398; Dion Joannou, President Cala, $1,524,061; Robert Mao, President Greater China, $2,184,486; McFadden, President Optical Networks, $3,763,963; Greg Mumford, Chief Technology Officer, $2,905,073; Stephen Pusey, President EMEA, $3,149,725; Steven Schilling, President Enterprise Accounts, $1,305,061; Spradley, President Wireline Networks, $2,921,115; Katharine Stevenson, Treasurer, $985,198; and Masood Tariq, President Global Alliances, $2,717,907.  The top Nortel executive's bonuses for 2003 totaled $48,691,075.

200.    In past years, most recently in July 2003, the awards had been granted entirely in the form of restricted stock.  This time, when the Board's Compensation Committee voted to award the shares in January 2004, it gave the executives half of that compensation in cash.  Nortel's stock later fell nearly 44%, meaning that if the executives had received Nortel stock instead of cash, they would have fared far worse. In addition, the Company withheld about a quarter of the shares granted to the employees to pay the taxes on the bonuses.  As a result, each of the executives received only about a quarter of their bonus in the restricted stock plan in shares.  A Nortel spokesman refused to say why Nortel paid cash bonuses while the review of its accounting was continuing.  Among those executives who received cash instead of stock were former controller defendant Gollogly, who was fired for cause in April 2004 and received $310,230 in cash; defendant McFadden, president of Nortel's Optical Networks unit, who received $1.49 million; Greg Mumford, Chief Technology Officer, who received $914,782; defendant Spradley, head of Wireline Networks, who received $922,084; and defendant DeRoma, general counsel, who received $851,145.  The cash payouts totaled $12.4 million to 16 executives.  The restricted stock bonus plan focused on Company

performance for 2003 to 2005, and provided four separate potential payments to the executives based on the Company's "return on sales before tax," a rarely used metric of corporate performance.

**The Truth Begins to Emerge About 2003**

201.   On March 10, 2004, the Company shocked its shareholders by revealing that Nortel would "need to delay the filing of the annual reports on Form 10-K for the year ended December 31, 2003." The Company further revealed that the restatement of Nortel's financial statements announced in October 2003 was inaccurate and Nortel would be restating its results *for the second time in less than six months*. Nortel stated:

> *As a result of the work done to date, Nortel Networks is re-examining the establishment, timing of, support for and release to income of certain accruals and provisions in prior periods. Nortel Networks believes it is likely that it will need to revise its previously announced unaudited results for the year ended December 31, 2003 and the results reported in certain of its quarterly reports for 2003, and to restate its previously filed financial results for one or more earlier periods.*

202.   On March 15, 2004, Nortel announced that it was placing Beatty and Gollogly on "leave." On March 17, 2004, an article in *The New York Times* quoted several Wall Street analysts who stated that Nortel's decision to put two of its top officers on leave "rais[ed] red flags, and suggest[ed] that the reasons for the delay in the audit might be more troubling than investors were led to believe." The article quoted Gina Sockolow, an analyst with Buckingham Research, as stating that the suspensions suggested *Nortel's accounting issues might well relate to the Company's questionable vendor-financing practices of the recent past. Sockolow stated that, if this proved to be the case, the problem could be traced back to Nortel CFO Dunn, who was also CFO in 2001, and warned that the troubles could force out Dunn*.

203.   In April 2004, Nortel announced that Dunn, Beatty, and Gollogly had been terminated for cause, and that the Company's planned restatement would now be even greater than previously disclosed. The press release stated:

While the Nortel Networks Audit Committee has not yet determined the full extent of the adjustments that will be required, it has determined that Nortel Networks previously announced unaudited results for the year ended Dec. 31, 2003 will need to be revised.  It has also determined that Nortel Networks will need to restate the financial results reported in each of its quarterly periods of 2003 and for earlier periods including 2002 and 2001.

Based on the Company's work to date with respect to the planned restatements and subject to the limitations described below, Nortel Networks preliminary partial estimates to date of the principal impacts of the restatements and revisions are as follows:

- a reduction of approximately 50 percent in previously announced net earnings for 2003; these amounts will largely be reported in prior periods, resulting in a reduction in previously reported net losses for such periods including 2002 and 2001;

- *a reported net loss for the first half of 2003 compared to the previously announced net earnings for that period.*

**Nortel's False Financial Reporting
During 2003**

204.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

205.    In Nortel's 2002 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

206.    Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and

delivery has occurred.  *See* SOP 97-2, ¶8; *see also* SAB No. 101.  During 2003, Nortel improperly recognized revenue even though these conditions did not exist.

207.    The fact that Nortel will restate its financial statements for all of 2003 as well as for periods from 2001 and 2002 will be an admission that the financial statements originally were false and that the overstatements were material.  Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by Nortel was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.  Thus, the restatement will be an admission by Nortel that its previously issued financial results and its public statements regarding those results were false.

208.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principles that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events

and circumstances that change resources and claims to those resources was violated (FASB Concepts No. 1, ¶40);

        (d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts No. 1, ¶50);

        (e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partially on evaluations of past enterprise performance (FASB Concepts No. 1, ¶42);

        (f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Concepts No. 2, ¶¶58-59);

        (g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions was violated (FASB Concepts No. 2, ¶79); and

        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts No. 2, ¶¶95, 97).

209.    Nortel has been badly damaged by defendants' fraudulent misconduct.  Defrauded investors have sued Nortel in two massive class action suits in the U.S. which expose Nortel to billions of dollars of damage and will cost many millions of dollars to defend.  In addition, Nortel is being subjected to several governmental and regulatory investigations, including investigations by the SEC and the DOJ, which will cost millions to defend and will likely result in large fines and/or penalties.  The credit rating agencies – Standard & Poor's, Fitch and Moody's – have all downgraded Nortel's credit rating.  Also because of the damage to Nortel's reputation and goodwill, the stock of Nortel currently trades at a substantial discount to the stocks of its peer group competitor companies and is likely to suffer from what is known as the "liar's discount" going forward.

210.    While Nortel and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the directorial oversight failings by the Nortel Board, the insiders and directors of this public company have not only suffered no damages but, in fact, have profited from their participation in the illegal conduct.  The managers of Nortel pocketed millions of dollars in salaries and bonuses which would have been denied them had the truth been disclosed.  These individuals have pocketed millions of dollars in salaries and bonus compensation as a result of their deceptive activities and the few individual officers who have been fired as scapegoats by the Board wishing to cover up its own participation and wrongdoing have left with millions of dollars in unjustly obtained compensation, bonuses and severance payments.  As a result of their concealments and falsifications, most of the directors of Nortel and the top managers of Nortel held onto their positions of power, prestige and profit at the Company.  The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest companies in Canada, enjoying the emoluments of their offices.

- 106 -

# FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty Against All Individual Defendants

211.   Plaintiffs incorporate ¶¶1-210.

212.   Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to misstate Nortel's financial statements in violation of applicable rules, regulations and industry standards, thus falsifying Nortel's SEC filings and communications to shareholders and investors, including Nortel's financial statements and information.   These defendants knew that if they disclosed the true facts concerning Nortel's business and financial condition, they would jeopardize their control over the companies, the remuneration they received and their positions of power, prestige and profit at Nortel, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

213.   As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nortel's operations, financial condition, assets and earnings to their shareholders, as well as the financial markets.  The Individual Defendants did not do this.  Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about Nortel to its shareholders.

214.   The Individual Defendants, as officers and/or directors of Nortel, participated in the acts of fraud and mismanagement alleged herein – knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to Nortel shareholders.  They have thus exposed Nortel to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased Nortel shares between October 24, 2000 and February 15, 2001 and April 24, 2003 and April 27, 2004 and two class action suits alleging violations of ERISA during 2000-2001.

215.     The Individual Defendants also each owed a duty to Nortel to test, oversee and monitor its systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia*, the Sarbanes-Oxley Act.  Pursuant to Sarbanes-Oxley, because Nortel was required to make accounting restatements due to noncompliance with GAAP and fraud in financial reporting as a result of the misconduct alleged herein, the Individual Defendants who served as CEO or CFO of Nortel and each of its operating units, respectively, are required to reimburse Nortel for the bonuses and other incentive-based and equity-based compensation received by them from Nortel.

216.     Independent of Sarbanes-Oxley, all Nortel's officers should be required to disgorge any and all gains unjustly obtained at the expense of Nortel and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

217.     The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

218.     By reason of the foregoing, Nortel has been damaged.

## SECOND CLAIM FOR RELIEF

### Abuse of Control Against All Individual Defendants

219.     Plaintiffs incorporate ¶¶1-218.

220.     For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Nortel and to continue to receive the substantial benefits, salaries and emoluments associated with their positions, the Individual Defendants employed the alleged scheme.  As a part of this scheme, these Individual Defendants actively made and/or participated in the making of or aided and abetted the making or the concealment of,

numerous omissions and misrepresentations of facts regarding Nortel to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

221.    The Individual Defendants' conduct constituted an abuse of their ability to control and influence Nortel. By reason of the foregoing, Nortel has been damaged.

# THIRD CLAIM FOR RELIEF

### Gross Mismanagement Against All Individual Defendants

222.    Plaintiffs incorporate ¶¶1-221.

223.    The Individual Defendants had a duty to Nortel and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Nortel.

224.    These Individual Defendants by their actions and by engaging in the fraud described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Nortel in a manner consistent with the duties imposed upon them by law, including Sarbanes-Oxley. By committing and concealing this fraud, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Nortel's affairs and in the use and preservation of Nortel' assets.

225.    The Individual Defendants caused Nortel to engage in a fraud upon purchasers of its stock and foreign exchanges. During the course of the discharge of their duties, these defendants knew or recklessly disregarded the unreasonable risks and losses associated with their fraud and misconduct, yet these defendants caused Nortel to engage in this scheme which they knew had an

unreasonable risk of damage to Nortel, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged Nortel.

226.    By reason of the foregoing, Nortel has been damaged.

# FOURTH CLAIM OF RELIEF

### Constructive Fraud Against All Individual Defendants

227.    Plaintiffs incorporate ¶¶1-226.

228.    As corporate fiduciaries, the Individual Defendants owed to Nortel and its shareholders a duty of candor and full accurate disclosure regarding the true state of Nortel's business and assets and their conduct with regard thereto.

229.    As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Nortel shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Nortel.  Thus they have committed constructive fraud and violated their duty of candor.

230.    By reason of the foregoing, Nortel has been damaged.

# FIFTH CLAIM FOR RELIEF

### Unjust Enrichment Against All Individual Defendants

231.    Plaintiffs incorporate ¶¶1-230.

232.    As a result of the conduct described above, all the Individual Defendants will be and have been unjustly enriched at the expense of Nortel in the form of unjustified salaries, benefits, bonuses, stock options and grants and other emoluments of office, as well as illegal insider stock sales.

233.     Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up the Director Defendants' complicity in the scheme.

234.     All the payments and benefits provided to these defendants were at the expense of Nortel, which received no benefit from these payments.  It was damaged by such payments.

235.     Certain of the Individual Defendants sold Nortel stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Nortel.  A constructive trust for the benefit of Nortel should be imposed thereon.

# PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby.

B.     Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon.

C.     Directing Nortel Networks Corporation to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Sarbanes-Oxley, including, but not limited to:

        (i)          appropriately testing and then strengthening the internal audit and control functions;

        (ii)        controlling and limiting insider stock selling; and

        (iii)      reforming executive compensation.

D.     Awarding punitive damages.

E.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  July __, 2004            LERACH COUGHLIN STOIA GELLER
                              RUDMAN & ROBBINS LLP
                          SAMUEL H. RUDMAN (SR-7957)
                          DAVID A. ROSENFELD (DR-7564)

                        _____

                            SAMUEL H. RUDMAN

                        200 Broadhollow Road, Suite 406
                        Melville, NY  11747
                        Telephone:  631/367-7100
                        631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
PATRICK W. DANIELS
MARY K. BLASY

_____
_

               WILLIAM S. LERACH

401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

S:\CptDraft \Derivative\CptWSLnortel netwks 7 4.doc

- 113 -