UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
LOCALS 302 AND 612 OF THE          :
INTERNATIONAL UNION OF OPERATING   :
ENGINEERS - EMPLOYERS CONSTRUCTION :          04 Civ. 5954 (LAP)
INDUSTRY RETIREMENT TRUST, INDIANA :
ELECTRICAL WORKERS PENSION TRUST FUND :            OPINION
IBEW, et al.                       :            AND ORDER
                                   :
          Plaintiffs,              :
                                   :
          -v-                      :
                                   :
JAMES J. BLANCHARD, et al.,        :
                                   :
          Defendants.              :
------------------------------------ x

LORETTA A. PRESKA, U.S.D.J.:

        Defendant Nortel Networks Corporation ("Defendant" or "Nortel")

presently moves to dismiss the derivative action filed by Plaintiff

Locals 302 and 612 of the International Union of Operating Engineers

- Employers Construction Industry Retirement Trust and Plaintiff

Indiana Electrical Workers Pension Trust Fund IBEW (collectively,

"Plaintiffs").  Counsel appeared on August 2, 2005 for oral argument

on the motion.  Upon consideration of the parties' written and oral

submissions, Nortel's motion to dismiss is granted.


I.   Background

        Nortel is a federally chartered Canadian corporation with its

headquarters and principal place of business in Brampton, Ontario,

Canada. (Compl., ¶ 60(a).)  Nortel is a supplier of networking

products using wireless and wireline technologies. (Id., ¶¶ 7, 18.)

        On February 15, 2001, Nortel publicly announced that it would

not grow as robustly as it had projected in previous months. (Id.,

¶ 20.) This announcement triggered a substantial drop in Nortel's stock price. Id. Twenty-five class actions were subsequently filed, alleging that Nortel's prior forecasts constituted securities fraud. (Id., ¶ 23.) Those cases are ongoing and have been consolidated before the Honorable Richard M. Berman ("Nortel I").

On October 23, 2003, Nortel publicly announced that it would file a restatement of certain past financial statements, adjusting approximately $952 million in liabilities that were recorded incorrectly. (Id., ¶ 32.) Nortel's Audit Committee then initiated an independent investigation of the circumstances between the fourth quarter of 2002 and the end of 2003 that caused the irregularities. On March 10, 2004, Nortel issued a press release describing the need for a further restatement to correct additional errors regarding liabilities that had been since detected. (Id., ¶ 35.) Shortly thereafter, Nortel terminated for cause its Chief Executive Officer, Chief Financial Officer and Controller, each of whom is a named defendant in this case. The March 10, 2004 press release inspired another series of class actions ("Nortel II") alleging the manipulation of reserves to achieve earnings targets. Those lawsuits are ongoing have also been consolidated before this Court.

Plaintiff Indiana Electrical Workers Trust Fund IBEW (the "Electrical Workers Fund") was one of the parties that originally filed a complaint in Nortel II. On July 1, 2004, this Court designated lead plaintiffs and lead counsel, which did not include the Electrical Workers Fund or its counsel. (Decl. of Tai H. Park

("Park Decl."), dated May 26, 2005, Ex. A.) One week later, on July 8, 2004, the Electrical Workers Fund demanded by letter (the "Demand Letter") that Nortel's Board investigate the allegations set forth in a 111-page draft complaint attached to the letter. (Park Decl., Ex. B.) The Demand Letter drew heavily from the allegations of Nortel I and Nortel II, though Plaintiffs claim that the letter expands upon the scope and magnitude of those allegations. The Demand Letter also requested that the Nortel Board commence legal proceedings against a number of current and former directors and employees of Nortel. (Id., Ex. B, ¶ 5.)

By July 20, 2004, Nortel's Corporate Secretary sent a letter in response, stating that the Nortel Board would review the matters discussed in the Demand Letter, would consider appropriate procedures to evaluate those matters and would provide a fuller response in due course. (Id., Ex. C, ¶ 2.) The Nortel Board then convened a special subcommittee comprised of the single new Board member who had not been listed as a potential defendant in the draft complaint, Dr. Manfred Bischoff. Dr. Bischoff was appointed to the Board in April 2004, well after the alleged malfeasance occurred. (Compl., ¶ 73.)

Notwithstanding Nortel's response letter of July 20, 2004, Plaintiffs filed the present Complaint on July 30, 2004. The five-count Complaint alleges that certain of the individual defendants engaged in accounting improprieties from 2000 to 2004, creating a distorted picture of Nortel's financial condition to inflate artificially Nortel's stock price, that individual defendants

unjustly enriched themselves by taking certain bonuses tied to

Nortel's allegedly inflated performance, and that Nortel was injured

as a result.[1] (Compl., ¶¶ 6-38, 40-44.)  The Electrical Workers Fund

subsequently filed a voluntary dismissal of its complaint in Nortel

II. (Park Decl., Ex. D.)

    Since the filing of the Complaint, Nortel has continued to take

remedial action.  On January 11, 2005, Nortel publicly filed a

restatement of financial data dating back to 2001, taking into

account revenue adjustments from 2001 to 2003.  Nortel published a

summary of the findings of its internal investigation and announced

that the independent review of revenue adjustments for 2000 and 2001

was underway and would continue.  Additionally, Nortel has demanded

the return of bonus payments from terminated employees, and on

January 31, 2005, Nortel commenced legal action in Canada against the

former Chief Executive Officer, Chief Financial Officer and

_____

    [1] Recent events in Canada also provide relevant background
to this case.  On July 28, 2004, two days prior to the filing of
this action, certain shareholders of Nortel commenced an
"oppression" proceeding in Ontario, seeking remedies for alleged
injuries to shareholders.  (Park Decl., Ex. E.)  Plaintiffs in
that case have asked the Canadian court for: (1) a declaration
that Nortel and certain of its directors and officers have
contravened Section 241 of the Canadian Business Corporations Act
("CBCA") and have "oppressed, unfairly prejudiced or unfairly
disregarded the interests of" plaintiffs and other class members
by approving and paying certain bonuses; (2) an order directing
an investigation into Nortel's payments under its bonus program;
(3) an accounting from certain directors and officers of the
benefits they received under the bonus program; and (4) a
declaration that certain of Nortel's directors and officers
caused the oppression. (Id., Ex. E, ¶ 2.)  The Canadian case
appears to resemble closely the instant case.

Controller who refused to comply with the request to return the bonuses. (Park Decl., Ex. G.)

Nortel filed the present motion to dismiss, contending that: (1) Canadian law applies to Plaintiffs' derivative action, and pursuant to the CBCA, a derivative action against a Canadian corporation must seek leave of a specifically enumerated Canadian court; and (2) Plaintiffs have not allowed Defendant sufficient time to respond to their demand as required under the CBCA.

II.  Standard for a Motion to Dismiss

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must view the complaint in the light most favorable to the plaintiff. Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir. 1985)(citing Conley v. Gibson, 355 U.S. 41, 47-48 (1957)).  I must accept as true the factual allegations stated in the complaint, Zinermon v. Burch, 494 U.S. 113, 118 (1990), and draw all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Hertz Corp. v. City of N.Y., 1 F.3d 121, 125 (2d Cir. 1993).  A motion to dismiss can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

III. Discussion

A.  Exclusive Jurisdiction of the Canadian Courts

Plaintiffs base their derivative suit on diversity of citizenship.  (Compl., ¶ 58.)  Accordingly, New York State conflict

of law analysis applies.  See Arochem Int'l, Inc. v. Buirkle, 968

F.2d 299, 269-70 (2d Cir. 1992); Hausman v. Buckley, 299 F.2d 696,

700 (2d Cir. 1962).  In considering derivative actions, the Court of

Appeals has unambiguously held that such actions are governed by the

laws of the forum of the company's incorporation:

> The right of a shareholder to object to conduct
> occurring in the operation of the corporate
> enterprise is determined by the law of the state
> of incorporation.  This includes acts that are
> beyond the purposes of incorporation, acts which
> are prohibited either by the state of
> incorporation or by the state where the acts are
> to be performed and the acts which are alleged to
> be beyond the authority of the officers or
> directors.

Hausman, 299 F.2d at 702-03 (internal citations omitted).  This

"internal affairs" choice of law doctrine is "well established and

generally followed throughout this country."  Id.

The internal affairs doctrine is equally applicable to a

foreign corporation.  Id. at 702-06 (applying Venezuelan law to

dismiss a derivative action brought on behalf of a corporation

chartered in Venezuela); Batchelder v. Kawamoto, 147 F.3d 915, 922

(9th Cir.), cert. denied, 525 U.S. 982 (1998)(dismissing derivative

action filed against Japanese company, where there was no standing

under Japanese law).[2]

---

[2] Further, stockholders impliedly consent to be governed by
the law of a corporation's state of incorporation when they
purchase stock in the company.  See Groom v. Mortimer Land Co.,
192 F. 849, 852 (5th Cir. 1912)("Stockholders . . . were
impliedly bound by such [state] laws as part of the organic law
of the corporation of which they were members."); Fleeger v.
Clarkson Co. Ltd., 86 F.R.D. 388, 395 (N.D. Tex. 1980)(quoting
Groom).  Here, Plaintiffs, as Nortel stockholders, have agreed to
be bound by the CBCA.

Nortel is a Canadian company incorporated under the CBCA. (Compl., ¶ 60(a).) Section 239 of the CBCA provides the governing law for derivative actions against Canadian corporations and enumerates specific Canadian courts where such actions may exclusively be heard.[3] Section 239(2) states that "no action may be brought . . . unless the court is satisfied that [the conditions precedent have been met]," and the term "court" is defined in Section 2 of the CBCA as various enumerated Canadian courts.[4]

---

[3] The full text of Section 239 reads:

Commencing derivative action
239. (1) Subject to subsection (2), a complainant may apply to a court for leave to bring an action in the name and on behalf of a corporation or any of its subsidiaries, or intervene in an action to which any such body corporate is a party, for the purpose of prosecuting, defending or discontinuing the action on behalf of the body corporate.

Conditions precedent
(2) No action may be brought and no intervention in an action may be made under subsection (1) unless the court is satisfied that
(a) the complainant has given notice to the directors of the corporation or its subsidiary of the complainant's intention to apply to the court under subsection (1) not less than fourteen days before bringing the application, or as otherwise ordered by the court, if the directors of the corporation or its subsidiary do not bring, diligently prosecute or defend or discontinue the action;
(b) the complainant is acting in good faith; and
(c) it appears to be in the interests of the corporation or its subsidiary that the action be brought, prosecuted, defended or discontinued.

[4] (1) In this Act, . . . "court" means:
    (a) in the Province of Newfoundland, and Prince Edward Island, the trial division or branch of the Supreme Court of the Province,
    (a.1) in the Province of Ontario, the Superior Court of Justice,

(continued...)

7

Both Canadian and United States courts have made clear that where the CBCA specifically establishes exclusive jurisdiction over an action, that choice of forum must be respected.  In <u>Nova Ban-Corp Ltd. v. Tottrup</u>, [1990] 1 F.C. 288 (F.C.T.D.), plaintiffs brought a derivative action under the predecessor to Section 239 in the Federal Court of Canada.  While plaintiffs had been given leave to proceed by the Court of the Queen's Bench in Alberta, when the plaintiffs sought relief in the Federal Court of Canada, the Court held that plaintiffs must bring their derivative action in one of the enumerated Section 2 courts.  "It is clear from subsections 232(2) and 234(2) that the action or application when brought must also be brought in the "court" as defined; namely, in Alberta, in the Court of Queen's Bench."  <u>Id.</u> at 293.  <u>See also</u> <u>Anderson v. Ralston Court Ltd.</u>, [1993] B.C.J. No. 2700 (Prov. Ct.)(QL)(provincial court lacked jurisdiction over action filed under British Columbia Corporations Act because Act defines a court as British Columbia Supreme Court).

United States Courts have followed this reasoning in deferring to Canadian courts.  In <u>Taylor v. LSI Logic Corp.</u>, 715 A.2d 837 (Del. 1998), the Delaware Supreme Court held that it lacked jurisdiction

---

(continued...)
(b) in the Provinces of Nova Scotia and British Columbia, the Supreme Court of the Province
(c) in the Province of Manitoba, Saskatchewan, Alberta and New Brunswick, the Court of Queen's Bench for the Province,
(d) in the Province of Quebec, the Superior Court of the Province, and
(e) the Supreme Court of Yukon, the Supreme Court of the Northwest Territories and the Nunavut Court of Justice.

over a shareholder action seeking an oppression remedy pursuant to Section 241 of the CBCA -- Section 241, like Section 239, contains express references to enumerated "courts." Relying on <u>Nova Ban-Corp</u>, the <u>Taylor</u> court held:

> We, therefore, find that it was the intent of the Parliament that actions brought under Section 241 of the Canada Business Corporations Act be brought only in the courts of Canada identified in Section 2 of the Canadian Act.

<u>Taylor</u>, 715 A.2d at 841; <u>see also</u> <u>Ison v. E.I. DuPont de Nemours & Co., Inc.</u>, 729 A.2d 832, 838 (Del. 1999)(construing <u>Taylor</u>, Supreme Court of Delaware observed that the "Canadian law at issue actually required adjudication in a Canadian Court leaving the Court of Chancery with no subject matter jurisdiction").[5]

Applying <u>Hausman</u>, the internal affairs doctrine and the <u>Taylor</u> line of cases to the present facts, there is no doubt that Canadian law applies to Plaintiffs' claims and that Section 239 of the CBCA requires Plaintiffs to seek leave of a Canadian court specifically enumerated in Section 2 of the CBCA. Accordingly, this Court cannot properly exercise jurisdiction over Plaintiffs' derivative action.

---

[5] <u>Nord Resources Corp v. Nord Pacific</u>, (2003), 35 B.L.R. (3d) 260 brings the <u>Taylor</u> line of cases full circle. Plaintiffs, having filed a derivative action in a New Mexico state court, moved to stay proceedings before the New Brunswick Court of the Queen's Bench in a parallel action brought under the New Brunswick Corporations Act, which, like Section 239 of the CBCA, defines "court" as a specific Canadian court. The New Brunswick Court held that the New Mexico court did not have subject matter jurisdiction over the derivative action and thus that the Canadian action should proceed. <u>Id.</u> at 35 B.L.R. (3d) 260.

Despite this relatively straightforward application of <u>Hausman</u> and the internal affairs doctrine, Plaintiffs attempt a theory by which their derivative action sidesteps the internal affairs doctrine allowing it to proceed in this Court. Plaintiffs initially maintain that they are not obligated to bring their derivative action under the CBCA and may instead bring their action under Sections 626 and 1319 of the New York Business Corporations Law ("NYBCL"), which allows shareholders of a foreign corporation to sue derivatively in the State of New York.[6]

While Plaintiffs seem to suggest that this choice alone resolves this motion in their favor, Section 626 by no means obviates the choice of law analysis that must proceed in any action based on diversity of citizenship. New York Courts must look to the law of the state of incorporation for all principles that will govern the action. <u>See</u> <u>Lewis v. Dicker</u>, 459 N.Y.S.2d 215, 216 (Sup. Ct. Kings

---

[6] Indeed, Plaintiffs also suggest that they are free to bring their derivative action under Canadian common law rather than the CBCA, as the CBCA (and specifically § 122(1)) is merely a codification of pre-existing common law. (Pl's. Br, 5.) However, Canadian courts have addressed this issue and held that the common law of derivative actions has been superceded by the statutory law of the CBCA. <u>See</u> <u>Shield Dev. Co. v. Snyder</u>, [1976] 3 W.W.R. 44 (enactment of British Columbia's statutory analogue to CBCA Section 239 abrogated the common law derivative remedy); <u>Farnham v. Feingold</u>, [1973] 2 O.R. 132 (analogous section of Ontario Business Corporations Act "embraces all causes of action under any statute in law or in equity, that a shareholder may sue for on behalf of a corporation"). The cases that Plaintiffs cite in support of their common law derivative action argument, <u>In re Credit Canadien Inc.</u>, [1937] S.C.R. 305 and <u>Peso Silver Mines Ltd. (N.P.L.) v. Cropper</u>, [1966] 58 D.L.R. (2d) 1, were both decided years before the CBCA was enacted in 1975 and are accordingly irrelevant (<u>Peso</u> appears to have been mistakenly cited by Plaintiffs as being decided in 1996 as opposed to 1966).

County 1982)(NYBCL § 1319 is "not a conflict of laws rule, and does not compel the application of New York domestic law" to derivative claims; instead, law of state of incorporation applies); In the Matter of CPF Acquisition Co., 682 N.Y.S.2d 3 (App. Div. 1st Dep't 1998)(remanding case where trial court erroneously applied demand requirement under NYBCL § 626 rather than those of Delaware, the state of incorporation); Hart v. General Motors, 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987)(applying Delaware law regarding adequacy of plaintiff's demand because "[o]ne of the abiding principles of the law of corporations is that the issue of corporate governance, including the threshold demand issue, is governed by the law of the state in which the corporation is chartered").

Faced with the choice of law analysis, therefore, Plaintiffs respond to Hausman and the internal affairs doctrine in two ways. Plaintiffs argue: (1) that Hausman is distinguishable from the present facts; and (2) that Section 239 of the CBCA is procedural rather than substantive and therefore should not bar the derivative action from continuing here. Both arguments are without merit.

Plaintiffs address Hausman in a single footnote. (Pl's. Br. at 18, n.17.) Plaintiffs argue that because Hausman concerned a requirement under Venezuelan law that the derivative plaintiff obtain the approval of a majority of the Venezuelan company's shareholders prior to commencing the derivative suit -- a requirement not imposed by the CBCA -- that Hausman is inapposite to this case. In essence, Plaintiffs argue that because the specific requirements of Venezuelan law and the CBCA are not identical, the principle enunciated in

11

*Hausman*, that a court must follow the internal affairs doctrine and look to the law of the forum of incorporation in adjudicating claims, is inapplicable. Plaintiffs are simply wrong; the difference between Venezuelan corporate law's majority requirement and the CBCA's requirement that a plaintiff seek leave of a specifically enumerated Canadian court before bringing a derivative action against a Canadian corporation does not diminish the relevance of the principles of the *Hausman* case to the present facts.[7]

Plaintiffs also argue that the leave of court requirement contained in Section 239 of the CBCA is procedural rather than substantive and, therefore, should not act as a bar to continuation of their derivative action before this Court. Plaintiffs cite *Woodling v. Garrett Corp.*, 813 F.2d 543, 551-52 (2d Cir. 1987), for the proposition that choice of law rules are designed only to import another forum's substantive law, not procedural law; however, Plaintiffs have not and, indeed, cannot show that Section 239 of the CBCA is merely procedural.

---

[7] While Plaintiffs point to *Messinger v. United Canso Oil and Gas, Ltd.*, 486 F. Supp. 788, 797-98 (D. Conn. 1980), in support of their position, there are multiple grounds to find *Hausman* far more persuasive authority. Passing for a moment that *Hausman* is binding and *Messinger* is not, the *Messinger* court did not address any conflict of law principles and failed even to mention *Hausman*. Additionally, because the facts underlying *Messinger* occurred prior to the enactment of the CBCA, the court noted that "the new statutes are not directly applicable to the instant case" and appeared to consider the new law in an advisory fashion. *Id.* at 793.

Relying on an excerpt from a treatise by Dennis H. Peterson, a well-regarded Canadian jurist also cited by Defendants, Plaintiffs attempt to describe Section 239 as procedural:

> The statutory derivative action [CBCA § 239] is a procedural code that allows certain parties in certain conditions to enforce rights or remedies that are otherwise available to the corporation as a question of substantive law.

Dennis H. Peterson, Shareholder Remedies in Canada § 17.28 (1989). Plaintiffs' attempt to characterize Section 239 as procedural, which is based solely on the Peterson quote and the previously distinguished <u>Messinger</u> case, fails for several reasons.[8]

---

[8] Over three weeks after Defendants submitted their reply brief in this case, Plaintiffs sent to the Court a request to file a sur-reply which actually attached the rather voluminous sur-reply that was the very subject of the request. Pursuant to <u>United States v. International Bus. Mach. Corp.</u>, 66 F.R.D. 383, 385 (S.D.N.Y. 1975), I rejected the submission:

> To permit the . . . papers to accompany the request, as they do in the instant case, is to enable the requesting party to accomplish its goal of placing the papers before the court, thereby reducing the question of whether the papers should be accepted for filing to relative unimportance.

<u>See also</u> <u>Travelers Inc. Co. v. Buffalo Reinsurance Co.</u>, 735 F. Supp. 492, 495 (S.D.N.Y. 1990), <u>vac'd in part on other grounds</u>, 739 F. Supp. 209 (S.D.N.Y. 1990).

The reply papers offered additional argument on the procedure versus substance question, specifically quoting one of Defendants' experts, Stanley M. Beck. Plaintiffs argue that Mr. Beck unequivocally stated that the CBCA's derivative action provisions are procedural in nature. In 1974, before the CBCA was passed, Mr. Beck wrote that: "[s]ome of the matters in [the CBCA's derivative action provisions] . . . are procedural only," "attempts to encourage shareholder litigation and clear the procedural thicket that all but blocks entrance to the courts," and "Professor Rostow has characterized such shareholder actions as 'the most important procedure the law has yet developed to

(continued...)

Initially, interpretation of foreign law falls entirely within the discretion of the Court. As Judge Keenan explained in Rutgerswerke AG & Frendo S.P.A. v. Abex Corp., No. 93 Civ. 2914, 2002 U.S. Dist. LEXIS 9965 (S.D.N.Y. June 4, 2002):

> Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: "The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. See Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980). Moreover, disagreement among legal experts on content, applicability, or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes. See Banco de Credito Indus., S.A. v. Tesoreria General, 990 F.2d 827, 838 (5th Cir. 1993); Bassis v. Universal Line, S.A., 436 F.2d 64, 68 (2d Cir. 1970); Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 737 (S.D.N.Y. 1986).

---

(continued...)
police the internal affairs of corporations." Stanley M. Beck, *The Shareholders' Derivative Action*, 52 CANADIAN BAR REVIEW 159, 168 (May 1974).

Passing that these papers were stricken, Plaintiffs mischaracterize the meaning of their own quoted selections. Mr. Beck quite obviously does not address any choice of law issues in these quotations, and therefore his comments do not bear on the procedure versus substance argument at hand. Additionally, Plaintiff's carefully chosen quotations are not sufficient to overcome the substantial and detailed Declaration provided by Mr. Beck in support of Defendant's position. (Decl. of Stanley M. Beck, dated May 15, 2005 ("Beck Decl."), ¶¶ 1-20.)

Id. at *16.  Plaintiff's singular reference to Mr. Peterson's

description of Section 239 of the CBCA as a "procedural code" is

insufficient to find the provision procedural rather than substantive

for choice of law purposes.  Far more informative and persuasive was

the Beck Declaration.  There, Mr. Beck, who has more than 30 years of

experience in corporate and securities law as a former Canadian law

professor and Dean of Osgoode Hall Law School in Toronto, Canada,

(Beck. Decl., ¶ 4), described the purpose of Part XX of the CBCA:

> Part XX, Remedies, Offences and Punishment, of the
> CBCA, ss. 238-252, provides a complete statutory
> code for shareholders' remedies.  Part XX
> encompasses derivative actions, an oppression
> remedy, restraining and compliance orders, and
> summary conviction offenses for failure to comply
> or filing false reports.  In addition, under the
> very broad powers given to the court under the
> oppression remedy section, the court can make an
> order directing an investigation, ordering the
> trial of an issue, or ordering the dissolution of
> the corporation.  In addition, Part XX contains
> with it a complete code for these particular
> remedies.

(Beck Decl., ¶ 7.)  He notes that "[c]ommon law remedies are

completely ousted by the remedial code under Part XX of the CBCA."

Id., ¶ 10.)  With respect to the leave requirement of Section 239,

Mr. Beck states:

> Given the definition of court set out above, under
> Canadian law with respect to corporations organized
> under the CBCA, a court other than a court set out
> in section 2 of the CBCA would lack jurisdiction to
> entertain a claim under Part XX of the Act, and in
> particular a derivative action under section 239.

Id. at ¶ 15.  Finally, Mr. Beck concludes:

> Canadian courts have consistently held that
> "matters of internal management of a corporation
> and questions affecting the status of a

> corporation" should be determined by the courts in
> the jurisdiction of the corporation's domicile.
> And given the very broad powers vested in the court
> under both the derivative action and the oppression
> remedy in Part XX of the CBCA, it is clear under
> conflicts of laws principles, apart from the very
> clear definition of court in section 2 of the
> Canada Act, that a derivative action and matters
> arising therefrom are matters for the courts in the
> corporation's domicile.

Id. at ¶ 20.  I find Mr. Beck's Declaration to be a correct statement of Canadian law on these topics.

Further, both the Supreme Court and Court of Appeals have found that demand rules in derivative actions are substantive in nature. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96-97, 108-09 (1991); RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1326-27 (2d Cir. 1991).  As stated in Hausman, "the issue is not just 'who' may maintain an action or 'how' it will be brought, but 'if' it will be brought."  Hausman, 299 F.2d at 701.  No determination could be more substantive.  Accordingly, the CBCA's leave requirement is "not a mere formality" but rather one of several substantive "statutory preconditions . . . intended to protect the corporation from undue interference."  Charas v. Sand Tech. Sys. Int'l Inc., No. 90 Civ. 5638, 1992 U.S. Dist. 15227 at *7 (S.D.N.Y. Oct. 7, 1992).

In sum, I find that the internal affairs doctrine mandates that the law of the forum of incorporation governs Plaintiffs' claims. Nortel is a federally-chartered Canadian corporation, and, therefore, the CBCA controls.  Section 239 of the CBCA requires that a plaintiff seek leave of a specifically enumerated Canadian court before proceeding with a derivative action.  Plaintiffs did not seek such

leave here, and consequently, this Court has no jurisdiction over Plaintiffs' claim.

      B.  <u>Failure to Afford Reasonable Time to Respond to Demand</u>

Pursuant to Section 239(2)(a) of the CBCA, a derivative action cannot be brought unless "the directors of the corporation . . . do not bring, diligently prosecute or defend or discontinue the action." Directors must be allowed a reasonable period of time to decide whether to take the action proposed in a shareholder's demand letter, and a court will not infer that a board has refused to bring an action simply because it has not issued a definitive answer. <u>See Tremblett v. S.C.B. Fisheries, Ltd.</u>, [1993] St. J. No. 2455, 1993 A.C.W.S.J. LEXIS 28013 (Nfl. Supr. Ct. 1993)(shareholder's application for leave to sue denied where board charged with investigating plaintiff's demand needed more time to determine whether legal action was appropriate).

This principle mirrors the law in the United States. Fed. R. Civ. P. 23.1 and analogous state law rules require that a demand be made or that shareholders plead with particularity exceptional circumstances that would render a demand futile. <u>See</u>, <u>e.g.</u>, <u>Scalisi v. Fund Asset Mgmt., L.P.</u>, 380 F.3d 133, (2d Cir. 2004); <u>Kaster v. Modification Systems, Inc.</u>, 731 F.2d 1014 (2d Cir. 1984); <u>RCM</u>, 928 F.2d at 1326; <u>Allison v. Gen. Motors Corp.</u>, 604 F. Supp. 1106, 1112 (D. Del.), <u>aff'd</u>, 782 F.2d 1026 (3d Cir. 1985).

Here, Plaintiffs allowed only ten days to elapse between Defendant's response to the Demand Letter and the filing of this

Complaint.  Defendant received the Demand Letter accompanied by a
111-page draft complaint on July 8, 2004.  Defendant's response,
dated July 20, 2004, stated that Defendant would "carefully consider
the matters raised in [the] letter and accompanying draft complaint
. . . [and] provide a response . . . in due course."  (Park Decl.,
Ex. C, ¶ 2.)  The Board then appointed an independent director to
investigate the allegations made in the Demand Letter and to analyze
whether such a derivative action would be in the company's best
interests.  (Compl., ¶ 73.)  On July 30, 2004, Plaintiffs commenced
the derivative action in this Court.

        The mere three weeks that Plaintiffs allowed to pass between
the Demand Letter and the initiation of this action runs entirely
afoul of the cases (both Canadian and United States) considering the
appropriate length of time between a demand and the filing of a
complaint.  Initially, the reasonableness of a time period for
investigating a demand varies "in direct proportion to the complexity
of the technological, quantitative and legal issues raised by the
demand."  Allison, 604 F. Supp. at 1117-18.  Plaintiffs do not cite a
single case, Canadian or otherwise, to stand for the proposition that
a three-week period between demand letter and complaint is sufficient
to investigate the complex financial and accounting issues at stake
here.

        In fact, the relevant case law weighs heavily against this
notion.  See Tremblett, 1993 A.C.W.S.J. LEXIS 28013 at *23-32 (30
days notice not reasonable where board's decision had to consider
evolving business consequences); Bellman v. Western Approaches Ltd.,

(1981), 130 D.L.R. (3d) 193 (B.C.C.A.)(finding that a good faith determination by the board that an action would not be in the best interest of the company "will be a bar to the bringing of a derivative suit by a shareholder"); Mozes v. Welch, 638 F. Supp. 215, 21-22 (D. Conn. 1986)(eight-month period between demand and filing of action deemed insufficient given complexity of legal issues, ongoing internal investigation and parallel criminal investigation); Charal Inv. Co., Inc. v. Rockefeller, No. Civ. A. 14397, 1995 WL 684869 at *3 (Del. Ch. Nov. 7, 1995)(five-month period deemed insufficient given complicated corporate waste scheme); Recchion v. Kirby, 637 F. Supp. 1309, 1319 (W.D. Pa. 1986)(two-months insufficient given complex securities fraud allegations).

Plaintiffs respond to this line of cases as they did Section 239's leave requirement. They describe the required interim period between demand letter and complaint as procedural rather than substantive. That argument fails here for the same reason it failed above; the determination of whether or not a derivative action will be brought is entirely substantive.

At oral argument, Plaintiffs also appeared to suggest that the 14-day notice requirement contained in the "conditions precedent" provision of Section 239, Section 239(2)(a)(1), was the only waiting period that the CBCA imposed on a plaintiff in a derivative action. Initially, however, to read the 14-day period as the only requirement would render meaningless the preceding clause which states that "a complainant may apply to a court for leave to bring an action . . . for the purpose of prosecuting, defending or discontinuing the action

19

on behalf of the body corporate."  For that clause to have any meaning, a corporation must be afforded reasonable time to evaluate and investigate a shareholder's demand letter.  <u>Tremblett</u>, 1993 A.C.W.S.J. LEXIS 28013 at *23-32.

Secondly, in addition to the 14-day requirement, according to Section 239(2)(c), a court must determine whether it "appears to be in the interests of the corporation or its subsidiary that the [derivative] action be brought, prosecuted, defended or discontinued."  As the Nortel Board has taken considerable action since receiving the Plaintiffs' Demand Letter (see pgs. 4-5, <u>supra</u>) and continues to take remedial steps, it is highly doubtful that a Canadian court would have viewed favorably the three-week window that Plaintiffs allowed Defendants between Demand Letter and Complaint, and Plaintiffs may not sidestep that determination by filing their derivative action here.

Accordingly, even if jurisdiction were present in this court, Plaintiffs have failed to satisfy the conditions precedent to filing a derivative action pursuant to Section 239 of the CBCA.

IV.   <u>Conclusion</u>

For the reasons set out above, Defendant's motion to dismiss is granted.   The Clerk of the Court shall mark this action closed and all pending motions denied as moot.


SO ORDERED.

August 24, 2005                    <u>Loretta A. Preska</u>
                                   LORETTA A. PRESKA, U.S.D.J.